## WIMER v. SIMMONS.
[39 Pac. 6.]

1. APPROPRIATION OF WATER FOR BENEFICIAL USE.— It is the general policy of the law to permit the waters of a stream to be appropriated for useful purposes, but not otherwise; and further, this right is not lost, though the entire appropriation may not be at once utilized, if the use is made within a reasonable time, to be determined by the circumstances of each case: *Simmons* v. *Winters*, 21 Or. 35; *Hindman* v. *Rizor*, 21 Or. 112; *Cole* v. *Logan*, 24 Or. 304; *Low* v. *Rizor*, 25 Or. 556, approved and followed.

2. ABANDONMENT OF WATER RIGHT.— When a water right is abandoned, the water becomes open to the public, and subsequent appropriators are entitled to it in the order of their priority. An abandonment by failure to apply the appropriation to some useful purpose is as effective as a direct act or statement: *Cole* v. *Logan*, 24 Or. 304, approved and followed.

3. ADVERSE POSSESSION OF WATER RIGHT*— NONUSER.—A water right may be lost by the adverse possession of another; but in such cases nonuser by the owner, and adverse user by another, for a period equal to that fixed by the statute of limitations relating to real property are necessary to divest title: *Dodge* v. *Marden*, 7 Or. 458, approved and followed.

* On this point see also *Huston* v. *Bybee*, 17 Or. 147.— REPORTER.

4. CHANGING PLACE OR PURPOSE OF USE OF WATER.— Where water has been appropriated, and within a reasonable time used for some beneficial purpose, the place or character of its use may be changed within the limits of the original right, even to the injury and total deprivation of one who has subsequently used the water after it had left the prior appropriator's ditch: *Cole* v. *Logan*, 24 Or. 313, cited.

5. ABANDONMENT OF WATER RIGHTS—TIME AS AN ELEMENT.— To constitute an abandonment of a right the appropriator must have intended a relinquishment, but his intent may be inferred from acts as well as from declarations. Time, of course, is not an essential element, for the moment that an intent to abandon unites with an actual relinquishment of possession the abandonment is complete: *Dodge* v. *Marden*, 7 Or. 460, approved and followed.

6. EVIDENCE OF ABANDONMENT.— Where it appeared that a ditch by which water was appropriated for mining was filled up at a certain point, by permission of the appropriators, with débris from a mine, but under an agreement that the mine owners should reopen the ditch upon request; that the ditch was not used beyond that point for fourteen years, but the water was actually employed during that time in the rest of the ditch; that the appropriators rejected several propositions to reopen the ditch and furnish water to persons beyond the point of obstruction, because it would not pay them; and that they frequently spoke of the unused part of the ditch as theirs, protected it from destruction, and refused to sell it; it is apparent that there was no intention to abandon the ditch beyond the point of obstruction.

7. ADVERSE POSSESSION OF WATER RIGHT—PRESCRIPTION.—Where plaintiffs and defendants were appropriators of water for mining purposes, and the water from defendants' ditch was discharged into the stream just above the head of plaintiffs' ditch, the fact that plaintiffs used the water so escaping from defendants' ditch for a period of fourteen years without interference by defendants does not create a right to use the same by prescription or by adverse possession, for the use under such circumstances did not constitute any invasion of the rights of defendants, it being neither exclusive, adverse, hostile, or under a claim of right: *Huston* v. *Bybee*, 17 Or. 147, and *Faull* v. *Cooke*, 19 Or. 455, cited and approved.

8. WATER RIGHTS—ESTOPPEL.—Where plaintiffs and defendants were appropriators of water for mining purposes, and at the time plaintiffs acquired their ditch defendants used only a part of theirs, but plaintiffs purchased with notice that their rights were subordinate to those of defendants, and that defendants had a right to operate their ditch to its full capacity, and plaintiffs never disputed such right, and never claimed any specific amount of water, the defendants are not estopped from taking enough water to fill their ditch, by the fact that for a number of years they had allowed considerable water to escape and go into plaintiffs' ditch.

APPEAL from Josephine: W. C. HALE, Judge.

This controversy grows out of conflicting claims to water rights by George W. and W. J. Wimer against George Simmons and T. and Z. Cameron, the parties hereto. The plaintiffs are the owners of a ditch used to divert water from the east fork of the Illinois River, in Josephine County, at a point opposite or immediately below the mouth of Allen Gulch. The point of diversion is on the east side of said fork, and is conducted thence in a southerly direction to where it crosses the same stream by means of a flume constructed for that purpose, and thence continues in a southerly and southeasterly course to the plaintiffs' mine, located in what is known as Butcher's Gulch, and finally runs into the west fork of said river. The ditch was constructed by Daniel Hunt in the year eighteen hundred and sixty, and is known as the Hunt or Wimer ditch. On September second, eighteen hundred and seventy-six, George Simmons, one of the defendants, and Walter Simmons, his brother, became its owners, and sold and conveyed the same to Jacob, George W., and W. J. Wimer by two conveyances of date July sixth, eighteen hundred and seventy-eight, and February seventh, eighteen hundred and eighty-three, respectively. On May twenty-third, eighteen hundred and eighty-eight, Jacob Wimer conveyed his interest to his two sons, George W. and W. J. Wimer, plaintiffs herein, and on July eighteenth, eighteen hundred and eighty-eight, they sold the property to Anna F. Smith, but on November thirty-first, eighteen hundred and ninety-two, again became the owners thereof through a sheriff's deed upon a sale under foreclosure proceedings against Anna F. Smith and W. I. Wadleigh. The defendants' ditch was constructed in the year eighteen hundred and fifty-six, and takes its water from the west bank of the same stream as the Hunt ditch, but at a point some two and a half or three miles above. When first constructed it was

about seven miles in length. A portion of the water diverted by this ditch was carried beyond the gulches known as Scotch, Allen, Sailor, Shelly, and Butcher's, and into Fry, Waldo, and Caro Gulches. The balance was used at Scotch Gulch, and through it discharged into the said east fork above the head of plaintiffs' ditch. This ditch, throughout its full length, with its branches, is known as the Scotch Gulch or Desselles and Connell ditch. In the year eighteen hundred and seventy-seven, while William Bybee was operating some mining ground at the head of Allen Gulch, he allowed the tailings and débris from his mine to be carried down to and across this ditch, and by this means it was filled up and obliterated for the space of some two or three hundred feet. From this time the ditch below the obstruction fell into disuse until the year eighteen hundred and ninety-one, when the defendants purchased the same from Desselles and Connell, together with their mining grounds at Scotch Gulch, and reconstructed and opened it again throughout its full length, including its branches, restoring it to about its original capacity. This ditch was purchased by Desselles and Connell, together with a placer mine of about twenty acres located in Scotch Gulch, in eighteen hundred and sixty-six, and they worked the mine every year from eighteen hundred and sixty-six down to eighteen hundred and ninety-one, with the possible exception of a year or two immediately preceding the year last named. As to this the proof is not clear. However, George Simmons, one of the defendants, operated the mine for about nine months during the years eighteen hundred and eighty-seven and eighteen hundred and eighty-eight under a contract to purchase from Desselles and Connell, and at the time of the purchase by defendants it was practically worked out. Some work was being done there when the evidence was taken in this case, but it is of little

moment. In eighteen hundred and eighty-eight some Chinamen mined in Allen Gulch, and by purchase from Desselles and Connell utilized from fifty to seventy-five inches of water from said ditch. It appears that during the latter part of spring, and during the summer and early fall, and at times during the winter months, there is insufficient water in the said east fork to suppy both these ditches, hence this suit to restrain defendants from carrying the water of said stream beyond Scotch Gulch and below the head of plaintiffs' ditch. The decree below being favorable to defendants, the plaintiffs appeal. Other facts sufficient for elucidation are alluded to in the opinion.                                          AFFIRMED.

For appellants there was a brief by *Messrs. Geo. W. Colvig, Robert G. Smith,* and *Bronaugh, McArthur, Fenton and Bronaugh,* and an oral argument by *Messrs. Earl C. Bronaugh, Robert G. Smith, Lewis L. McArthur,* and *William D. Fenton.*

For respondents there was a brief by *Messrs. Carey, Idleman, Mays and Webster, C. W. Kahler,* and *Hammond and Vawter,* and an oral argument by *Mr. Lionel R. Webster.*

Opinion by MR. JUSTICE WOLVERTON.

The plaintiffs contend that they are entitled to the quantity of water that has been carried through their flume at the crossing of the east fork of the Illinois River during the period intervening from eighteen hundred and seventy-seven to eighteen hundred and ninety-one. They base their claim of right upon the following propositions: (1) The owners of the defendants' or Scotch Gulch ditch abandoned all that part of it below Scotch Gulch in eighteen hundred and seventy-seven; (2) the owners of said ditch abandoned all the water thereof that was turned or

allowed to flow back into said stream through Scotch Gulch in eighteen hundred and seventy-seven; and (3) plaintiffs have acquired a prior and perfect right to the waters of said stream as against defendants by adverse possession and use during the time intervening from eighteen hundred and seventy-seven to eighteen hundred and ninety-one.

1.   It is the policy of the law that water of a stream shall be appropriated to the extent only that it is put to or designed for some useful or beneficial purpose. This is the measure of the appropriation. The entire appropriation may not be utilized at once for the purposes designed. In such case a reasonable time is allowable within which to make the application to such purposes, and the surroundings and circumstances of each particular case are elements for consideration in determining what is a reasonable time within which to complete and fix the extent of the appropriation: *Hindman* v. *Rizor,* 21 Or. 112 (27 Pac. 13); *Simmonds* v. *Winters,* 21 Or. 35 (27 Pac. 7, 28 Am. St. Rep. 727); *Low* v. *Rizor,* 25 Or. 556 (37 Pac. 82); *Cole* v. *Logan,* 24 Or. 304 (33 Pac. 568); *Sieber* v. *Frink,* 7 Colo. 154 (2 Pac. 901).

2.   A prior appropriator having the exclusive right to the use of part of or all the water of a stream may lose the same by abandonment. When abandoned, the water becomes *publici juris,* and subsequent appropriators are entitled to it according to their respective priorities. The abandonment may be express and immediate, as by the intentional act of the owner and possessor of the right, or it may be implied from his neglect, failure of application to the purpose designed within a reasonable time, nonuser, and the like: Kinney on Irrigation, § 253; Black's Pomeroy on Water Rights, § 96.

3.   The right of a prior appropriator may also be lost by the adverse possession of another. Nonuser by the

owner of the right, and adverse user of it by another, for a time equal to the period fixed as the limitation of actions for the recovery of real property, is necessary in this state to work a forfeiture through this method: Black's Pomeroy on Water Rights, § 98; *Dodge* v. *Marden,* 7 Or. 458; *Union Water Company* v. *Crary,* 25 Cal. 508 (85 Am. Dec. 145). These general propositions of law are well established, and it is unnecessary to support them further by citation of authorities. Keeping them in mind let us consider the relative rights of the parties in the light of the facts as disclosed by the testimony.

For some years prior to eighteen hundred and seventy-seven the Desselles and Connell ditch carried from six hundred or seven hundred to a thousand inches of water to Scotch Gulch. Beyond that Desselles says "it would carry about four hundred inches." In answer to the question, "How many inches flowed down the ditch beyond Scotch Gulch," he replies: "Three hundred and fifty inches, used by Joseph Smith in Scotch Gulch, Spellman and Brother in Allen Gulch, some Chinamen in Sailor Gulch, and Shelly and Company below the town of Waldo for mining and irrigating purposes." George Simmons, one of the defendants, in answer to the question, "How does the size of the ditch since you cleaned it out compare with the size of it as it was when the Wimer ditch was dug?" answered: "Oh, it is about the same size." W. J. Wimer, one of the plaintiffs, testifying in August, eighteen hundred and ninety-three, says that defendants at that time were carrying in their ditch beyond Scotch Gulch three hundred or four hundred inches. He thought three hundred inches at any rate, while plaintiffs were at the same time carrying from one hundred and fifty to two hundred inches. Considering that defendants' ditch intercepts the stream above that of plaintiffs', it is probable that water was flowing therein beyond Scotch Gulch to

the extent of its average capacity. The mines at Scotch
Gulch, which the defendants purchased with the ditch
from Desselles and Connell, are practically worked out,
so that they are unfit for profitable mining. George Sim-
mons says, in effect, that Scotch Gulch is mined out—the
most of it; that there are no mines there to amount to
anything; that there is one man there now working with a
pick and shovel. This was the probable condition of these
mines at the date of defendants' purchase in eighteen
hundred and ninety-one, as it does not appear that they
have ever been worked by them since they became the
owners thereof. We deduce from this the defendants'
intentions at the time of the purchase. It was not to
work the mine at Scotch Gulch, but to carry the water
beyond, to the extent of the capacity of the old ditch, for
use at such points as might be convenient. The evidence
on this point is quite meager, and we can only judge of
the intended use by that which they are now making of
it. George Simmons says they are using a little for min-
ing purposes at their mine, probably fifty inches, and
some for irrigating grass and cultivated crops; that they
"turned some of it down the river to the ranch, that
Wimers ought to have turned the water out to irrigate,"
and "run a little water down to Decker." He also says
they have valuable mining property that it will take a
number of years to work out; so that the use which
defendants are making of the water is not dissimilar to
that which Desselles and Connell made of it prior to
eighteen hundred and seventy-seven beyond Scotch
Gulch, except that defendants appear to be employing
the same for mining and irrigation on their own account,
while Desselles and Connell sold to third parties for like
uses and purposes. No question is made but that a valid
appropriation prior to that of plaintiffs was made by the
predecessors of defendants of the water of the said east

fork for use at Scotch Gulch for mining purposes, and that the relative position and rights of the parties continued unchanged to the year eighteen hundred and seventy-seven. The contention that defendants' predecessors abandoned their ditch below Scotch Gulch in that year, by allowing it to become obstructed, and to fall into disuse at that time, presupposes this state of facts, as there can be no abandonment unless such right or privilege existed in some person or persons who could waive its benefits.

4. A valid appropriation having once been made of the water of a stream, it becomes a pertinent inquiry whether it is permissible to change the place of its use. Undoubtedly there could be no objection to such change where it does not injuriously affect third parties. The predecessors of defendants, prior to eighteen hundred and seventy-seven, used a portion of the water appropriated by them beyond Scotch Gulch. From eighteen hundred and seventy-seven to eighteen hundred and ninety-one this water was used at Scotch Gulch, and allowed to flow into the river again at a point above the head of plaintiffs' ditch, so that they secured the use of the surplus after use by defendants' predecessors for mining purposes. In eighteen hundred and ninety-one the defendants, having succeeded to the rights of their predecessors in their appropriation of water, again changed the place of its use, and carried a portion of it beyond the head of plaintiffs' ditch where it was entirely lost to them. By this plaintiffs claim they are injuriously affected, and that defendants are without lawful authority for so doing. The question as to whether or not plaintiffs are, in legal contemplation, so injuriously affected is involved in the consideration of the right of defendants to change the place of use. If they had such right, then no injury can result

27 OR.—2.

to the plaintiffs by reason of the change of which they can justly complain. BURNETT, J., in *Maeris* v. *Bicknell,* 7 Cal. 263 (68 Am. Dec. 257), says: "The next question that arises in this case is, whether a party who makes a prior appropriation of water can change the place of its use without losing that priority as against those whose rights have attached before the change. This question, we think, can admit of but one answer. It would seem clear that a mere change in the use of the water from one mining locality to another, by the extension of the ditch, or by the construction of branches of the same ditch, would by no means affect the prior right of the party. It would destroy the utility of such works were any other rule adopted." In *Davis* v. *Gale* 32 Cal. 33 (91 Am. Dec. 554), the court say: "Suppose a party taps a stream of water for the purpose of surface mining in a given locality, and afterwards finds that the ground will not pay, or that ground further on will pay better, may he not abandon the former and extend his ditch to the latter without losing his priority? Or suppose, after working off the surface, he finds quartz, may he not erect a mill and convert the water into a motive power without forfeiting his prior right? * * * We think all this may be done, and are unable to suggest a plausible reason why it may not. In cases like the present a party acquires a right to a given quantity of water by appropriation and use, and he loses that right by nonuse and abandonment. Appropriation, use, and nonuse are the tests of his right; and place of use and character of use are not. When he had made his appropriation, he becomes entitled to the use of the quantity which he has appropriated at any place where he may choose to convey it, and for any useful and beneficial purpose to which he may choose to apply it. Any other rule would lead to endless complications, and most materially impair the value of water rights and

privileges." See also *Woolman* v. *Garringer,* 1 Mont. 535;
Kinney on Irrigation, § 233.

The nature of the use for which water is appropriated
operates as notice to subsequent appropriators whether
the place of use may or may not be changed. If the
purposes for which it is to be applied have the effect of
eliminating it from existence, absorbing it, using it up
absolutely, then it can make no kind of difference to sub-
sequent appropriators in what locality it may be utilized.
Of such nature is the appropriation of water for irriga-
tion purposes. BEATTY, J., in *Last Chance Mining Company*
v. *Bunker Hill Mining Company,* 49 Fed. 432, says: "The
appropriation of water for placer mining purposes at
some specified place involves a somewhat similar prin-
ciple. It is such an actual appropriation of a definite
amount, and for such purposes, as, in the nature of things,
must operate as a notice to all that its place of use must,
from time to time, as the ground is worked, be changed.
Should one use the water after it passes from the works
of the prior claimant, he must do so at his own risk, and
he cannot complain that changes are made which he had
full notice would likely occur." See also *Lowden* v. *Frey,*
67 Cal. 474 (8 Pac. 31); *Ballard* v. *Stone,* 67 Cal. 477 (8 Pac.
17); *Ramelli* v. *Irish,* 96 Cal. 214 (31 Pac. 41). A case
very much in point is that of *Meagher* v. *Hardenbrook,* 11
Mont. 385 (28 Pac. 451). The survey of the "Miner's
Ditch" was commenced in the latter part of the year
eighteen hundred and sixty-nine. It was built and owned
jointly by twenty-four persons, each being represented
by a share. At the time of the commencement of the
action the defendants Hardenbrook and Kelly were the
owners of eight and three shares, respectively. The
owners of the ditch were at the same time owners of cer-
tain placer mines in three different gulches. In the
summer of eighteen hundred and seventy-one the water

was turned in as far as Prairie and Spring Gulches, and a year later into Antelope Gulch. "Miner's Ditch" was abandoned in eighteen hundred and eighty-six, since which time none of its waters had been used for placer mining, but were turned into Racetrack Creek, and recaptured by Hardenbrook, and used for the purpose of irrigating land belonging to him to the extent of four hundred inches. It was held by the court that all the waters of "Miner's Ditch" were abandoned in eighteen hundred and eighty-six, except the four hundred inches used by Hardenbrook, and to that extent they were not. It was taken for granted by both the counsel and the court that the place of use could be changed, and the court went further, and held that the mode and manner of use could also be changed. The doctrine that a prior appropriator for the purposes of irrigation may change the place of its use is recognized by this court in *Cole* v. *Logan,* 24 Or. 304, 313 (33 Pac. 568). We take it, then, that where the appropriation is made for the purposes of placer mining and irrigation, and the water thus appropriated has been actually used for those purposes for a term of years, as in this case, the place of its use may be changed at the pleasure of the owners and possessors of the right, and that plaintiffs cannot be heard to complain on that account. The defendants, therefore, had the right to change the place of the use in eighteen hundred and ninety-one from Scotch Gulch to such point or points beyond as they could make the water available for mining and irrigation purposes, unless, as is claimed by plaintiffs, the right to flow water past Scotch Gulch was abandoned by defendants' predecessors in eighteen hundred and seventy-seven.

5.   An abandonment of a right is a forsaking or desertion of it, and operates as a relinquishment thereof. There can be no abandonment without some action of the will and an intent to abandon, but such intent may be in-

ferred from the acts and declarations of the party against whom the relinquishment is claimed. Time is not, however, an essential element of abandonment. The moment the intention to abandon and the relinquishment of possession unite, the abandonment is complete: *Mallett* v. *Uncle Sam Mining Company,* 1 Nev. 204 (90 Am. Dec. 484); *Dodge* v. *Marden,* 7 Or. 460.

6. As we have seen, Desselles and Connell carried through their ditch beyond Scotch Gulch prior to eighteen hundred and seventy-seven, some three hundred and fifty or four hundred inches of water, which, to the extent of three hundred and fifty inches, was actually used for mining and irrigation purposes. By this use it is admitted by plaintiffs that Desselles and Connell acquired a perfect and subsisting right, prior and superior to any right of theirs, to the use of the water of said stream. But it is claimed that Desselles and Connell abandoned their right to flow water beyond Scotch Gulch in eighteen hundred and seventy-seven, and that plaintiffs subsequent appropriation thereof gives them a right superior to defendants, and that on this account no right exists in the defendants at this time to the use of any part of the water of said stream at any point below Scotch Gulch, whereby its use would be lost to plaintiffs. The evidence is clear that the ditch was filled up in eighteen hundred and seventy-seven for the space of two or three hundred feet at Allen Gulch by the tailings and débris from William Bybee's mine. Desselles and Connell gave permission for this to be done, but with the express understanding that Bybee should open it again when called upon to do so. True, they never called upon Bybee to clean it out, but there is no intention manifest on their part to abandon this ditch at that time. The transaction would indicate an intention quite to the contrary. If not abandoned at that time, was it abandoned later? James W.

Wimer, a brother of plaintiffs, testifies: ''My father made them (Desselles and Connell) a proposition to repair the ditch, and to furnish water, and they refused to do so.'' W. J. Wimer, one of the plaintiffs, testifying to the same conversation, says: ''Father wanted to have water to irrigate his orchard at Waldo, and he bought the orchard of Mr. Simmons,—quite a fine orchard,—and he wanted to irrigate it. People said it wouldn't live unless he did, and the town was dry, and he proposed to try to get the water from Scotch Gulch, from defendants' ditch, being the only chance to get it, so he approached them about rebuilding the ditch, and we talked it over in the store a number of times, both Mr. Desselles and Mr. Connell and father and myself. I think, though, father done nearly all the talking. And they asked us, in reply to our question whether they would bring the water in there or not, —they asked us one hundred dollars per year. They said they would do it for one hundred dollars a year, if we would rebuild the ditch; they said they would sell us the water for one hundred dollars a year. * * * But they stated there in my presence,—and I talked with them my- self,—they stated there was nothing in it to rebuild the ditch, and I remarked that it was pretty steep for a man to rebuild the ditch and to have to give one hundred dol- lars for the water, and they said it was worth one hun- dred dollars for the water, and there was nothing in it for them to rebuild the ditch. That is what they said, and they wasn't going to rebuild the ditch.'' This was in eighteen hundred and seventy-seven, but after the Scotch Gulch ditch was filled up, and before witness first became interested in plaintiffs' said ditch and mine. The witness, continuing, says: ''In answering that question I don't wish to be understood, in order to make my evidence look big,—I don't say that they said the ditch would not be extended,—I don't mean to say they said they never

would do it. I mean to say that they repudiated or re-
jected our proposition." T. A. Jackson's testimony is to
the same purport, but he thinks the conversation oc-
curred in eighteen hundred and eighty.

James Spence testifies: "I endeavored at one time to
buy water—spoke to Mr. Connell. I had a mining claim
on what is called Sailor Gulch. I spoke to Mr. Connell;
told him I had a claim on Sailor Gulch, and I would like
to buy water of him, if he would sell me any. He re-
marked that it would take more money to fix up the ditch
than there was in my ground, and his remarks were to
the effect that he wouldn't do it." This was in eighteen
hundred and seventy-eight or eighteen hundred and sev-
enty-nine. The witness wanted about fifty inches of wa-
ter to work a small piece of ground. Sailor Gulch is
about two and a half miles, by the ditch, below Scotch
Gulch. Daniel Hunt testifies: "I don't remember whether
they said anything particularly about it or not, but I have
heard Connell speak frequently about their water; they
always thought their water would work Fry Gulch, and
was the only water that would. The other ditch is a good
deal lower, and wouldn't have the pressure, and he has
always talked more or less about it. I never paid par-
ticular attention to it." In answer to question one thou-
sand and twenty-two, "Did you have any talk with Des-
selles and Connell upon the subject of taking the water
around Fry Gulch?" George Simmons says: "I have heard
them speak about taking the water around there"; and to
question one thousand and twenty-three, "What did they
say about it?" he answers, "They were talking about Fry
Gulch being mining ground, and they said they thought
that when they got through with Scotch Gulch they would
take it down there." William Darkis testifies: "I heard
Jim Connell say that when they worked out their claim
the ditches could be run to town (Waldo), and they could

sell them there,—work the Johnsons' ranch." T. Cameron, one of the defendants, testifies: "He (Desselles) said,—it was in the spring of eighteen hundred and ninety-one,—I asked him if he had ever abandoned any part of that ditch or any branch of it, or any part of it, and he said he had not"; and to interrogatory nine, "State whether or not you abandoned any part of said ditch below Scotch Gulch?" J. B. Desselles answered, "We did not." Interrogatory ten: "Did you or did you not exercise acts of ownership over said ditch through its entire length until you sold it to Simmons and Company in eighteen hundred and ninety-one?" Answer—"We did, with the exception of nine months." Cross-interrogatory seventeen: "What act of ownership did you exercise over said ditch beyond Scotch Gulch after you acquired it?" Answer—"We claimed it was our own; we protected the ditch, and tried to keep the people from destroying it, and we refused at one time to sell that part of the ditch from Scotch Gulch to Waldo." This latter answer is corroborated by another witness, who says that Desselles refused to sell the lower part of the ditch unless he could sell the whole. The nine months mentioned in Desselles' testimony, in which he and Connell failed to exercise ownership in the ditch, refers to the period during which George Simmons was in possession, under contract for purchase.

From all this we are to gather the intention of Desselles and Connell with reference to an abandonment by them in eighteen hundred and seventy-seven of their right to carry water beyond Scotch Gulch. The part of their ditch used for this purpose undoubtedly fell into disuse at that time, and was allowed by them to continue so until eighteen hundred and ninety-one, when they sold to defendants. The water, however, diverted from the said east fork by means of their ditch, was used by them dur-

ing nearly all this time for mining purposes at Scotch Gulch; so that, while a portion of the ditch fell into disuse, the water was actually employed for a beneficial and useful purpose. Whatever might have been the presumption arising by reason of the nonuse of the water for this great length of time, it cannot prevail here, because the water itself was utilized; and, as we have seen, Desselles and Connell had a perfect right to change the place of its use. Thus it is demonstrated, without further reasoning, that the right to the use of the water was not abandoned by them. Aside from this consideration, the fact that Desselles and Connell arranged with Bybee for opening their ditch again before they allowed it to be closed; that they from time to time entertained and considered propositions from different persons for opening out this ditch, and the employment of the same for conveying water to different points below Scotch Gulch; that they refused to sell this part of the ditch without the whole; and that they contemplated using the water through this ditch at Fry's Gulch when their mines were worked out at Scotch Gulch,—all tend to show that there was an entire absence during all these years of any intention on the part of Desselles and Connell to abandon their right to the use below Scotch Gulch of the water diverted by means of their ditch. Hence, there was no abandonment by Desselles and Connell of the ditch below Scotch Gulch, or of the water thereof, in eighteen hundred and seventy-seven. The claim of plaintiffs is, in effect, that Desselles and Connell abandoned a more general appropriation for a particular one, that of placer mining at Scotch Gulch, and that since such was the case, they were powerless to again resume their original appropriation to the injury of plaintiffs. The logical result of this contention, if successful, would be to deprive Desselles and Con-

27 OR.—3.

nell entirely of their appropriation as soon as their mines at that point were exhausted, and it has been shown that the mines were practically worked out at the time they sold to defendants. From a very careful review of the whole testimony, we have not found that Desselles and Connell at any time designed or intended to place any different limitation upon their appropriation than that which existed at the time they became the owners and possessors of the right; hence there was no abandonment upon their part. Much stress was laid upon the case of *Schulz* v. *Sweeny,* 19 Nev. 359 (3 Am. St. Rep. 888, 11 Pac. 253), and cases of like nature, as authority in point showing an abandonment. In the case referred to, the very act of discharging the water again into a natural channel, by reason of the nature of the use, and the absence of an intention to reclaim, constituted an abandonment. Such is not the case here.

7. We will now consider whether plaintiffs have acquired a prior and superior right to the water of the east fork of the Illinois River, as against defendants, by adverse possession and use during the time intervening from eighteen hundred and seventy-seven to eighteen hundred and ninety-one. In order to establish a right by prescription acquired by adverse use, the acts relied upon to constitute such prescriptive right must have been an invasion of the rights of the party against whom it is set up of such a character as to afford him grounds of action: *Anaheim Water Company* v. *Semi-Tropical Water Company,* 64 Cal. 192 (30 Pac. 623); *Union Mining Company* v. *Ferris,* 2 Sawy. 187 (Fed. Cas. No. 14371). To bar the right of the defendants the use of the water by plaintiffs must have been under a claim of right, open, notorious, exclusive, adverse, and hostile to that of defendants and those under whom they derive title: *Faull* v. *Cooke,* 19 Or. 467 (20 Am. St. Rep. 836, 26 Pac. 662); *Thomas* v. *England,* 71 Cal.

458 (12 Pac. 491); *Alta Land Company* v. *Hancock,* 85 Cal.
226 (20 Am. St. Rep. 217, 24 Pac. 645); Kinney on Irri-
gation, § 294.   The use of water under a license or by
permission of the prior appropriator is not hostile, and
cannot support a claim of right by prescription or adverse
user: *Huston* v. *Bybee,* 17 Or. 147 (2 L. R. A. 568, 20 Pac.
51); *Feliz* v. *City of Los Angeles,* 58 Cal. 73.   That plaintiffs
have had the use of the water diverted by means of de-
fendants' ditch during the time alleged, after use thereof
by defendants at Scotch Gulch, there is no question.   But
such use was not adverse to the right of defendants;
neither their rights nor those of their predecessors were
invaded thereby.   At no time could Desselles and Connell
have maintained an action against the plaintiffs by reason
of their appropriation of the water that was allowed to
escape after use down the main channel of the said east
fork above the head of plaintiffs' ditch.   The use by
plaintiffs was, during all this time, simply by the permis-
sion and indulgence, or rather at the sufferance, of Des-
selles and Connell.   These conditions could neither create
nor support a right or title by prescription or adverse
possession.   As was said in *Woolman* v. *Garringer,* 1 Mont.
535: "The plaintiffs could acquire no other than a mere
privilege or right to the use of the waste water, or, at
most, but a secondary and subordinate right to that of the
first appropriators, and only such as was liable to be de-
termined by their action at any time."   See also *Ball* v.
*Kehl,* 95 Cal. 606 (30 Pac. 780).

8.   Now as to the estoppel invoked in behalf of plain-
tiffs and against defendants.   It is contended that "One
who stands passively by and allows another to open out
fields and irrigate them with water, or another to open
up mines and use water to work them, for thirteen years,
under the belief that he has a vested right to the use
thereof, is estopped from subsequently denying this right."

Such a condition of things would perhaps be sufficient to create an estoppel *in pais,* if it be implied that the defendants or their prede.:essors in interest in good conscience ought to have spoken in the assertion of their rights, and that by reason of their passiveness or nonaction plaintiffs have been misled to their injury.  "Nobody ought to be estopped from averring the truth or asserting a just demand unless, by his acts, or words, or neglect, his now averring the truth or asserting the demand would work some wrong to some other person who has been induced to do something or to abstain from doing something by reason of what he had said or done, or omitted to say or do": 1 Herman on Estoppel and Res Judicata, § 7, subdivision 5.   The question, then, is one of fact to be determined upon the evidence whether, *first,* the defendants or their predecessors were in duty bound to make any other assertion of their rights than their acts during the time mentioned would indicate; and, *second,* whether the plaintiffs have been misled to their injury.   Defendants contend that there has been an enlargement of plaintiffs' ditch since the Wimers first acquired an interest in it subsequent to the year eighteen hundred and seventy-seven. Plaintiffs assert the contrary.   But assuming, without deciding, that their ditch was, at the commencement of this suit, of the same capacity as when first constructed in eighteen hundred and sixty, the most natural deduction to be made is that the capacity of this ditch is the measure of the first appropriation made by means thereof when constructed.   At that time a prior appropriation had been made by means of the Scotch Gulch ditch, and presumably water was being carried to points below Scotch Gulch, so that it did not again intercept the stream above plaintiffs' ditch.   The appropriation, therefore, through plaintiffs' ditch at this early date was in subordination to the rights of defendants' predecessors.   This state of facts existed

in eighteen hundred and seventy-seven. Since that time plaintiffs assert they have used the same ditch without an enlargement of its capacity down to the present time. Like conditions were prevalent in this respect since eighteen hundred and seventy-seven as existed prior thereto. There was nothing, then, in these conditions by which defendants were even impliedly notified that plaintiffs were increasing or had at any time increased their appropriation; and no direct notice was ever given defendants or their predecessors of any claim of an increased appropriation, or that defendants' rights were regarded as having been subordinated to the rights of plaintiffs, until shortly prior to the defendants' purchase from Desselles and Connell in eighteen hundred and ninety-one. The simple fact that plaintiffs were using the water during this time, after use by defendants and their predecessors, and, as we have seen, by their sufferance, was not an infraction of the latters' rights. Hence we see nothing in the surroundings making it incumbent upon the defendants or their predecessors to make protest against the acts of plaintiffs.

Were plaintiffs misled to their injury? W. J. Wimer was asked, "Did you ever have any conversation with Mr. Simmons about the size of this (plaintiffs) ditch at the time you bought it?" to which he replied, "My father did in my presence. My father asked Mr. Simmons, when we were talking about buying in the property, about the ditch, and he said that our headbox was a six-foot box,— six feet wide and five feet high,—and that we were entitled to build our entire ditch that size." Again, "Did he say anything about his rights against the Scotch Gulch ditch?" Answer—"Well, we asked him that question, if there was any prior adverse rights, and he said the Scotch Gulch ditch was a first right over his ditch; that they were running the water in the river above the

headgate, and he didn't think they would ever take it out." In eighteen hundred and eighty-two witness, by a report made of the Scotch Gulch ditch and mine |to the director of the United States mint for publication in the United States Gold and Silver Mining Report, in effect recognized the rights of Desselles and Connell to the full extent as claimed by them to carry water below Scotch Gulch. In the winter of eighteen hundred and eighty-eight and eighteen hundred and eighty-nine, some Chinamen used water from the Scotch Gulch ditch in Allen Gulch. At this time Mrs. Anna F. Smith was the owner of the plaintiffs' ditch, but was operating it through W. I. Wadleigh, who was her recognized agent. Wadleigh testified concerning this incident — and incidentally of the rights of Desselles and Connell at that time — as follows: Question — "By whom was it used?" Answer — "By some Chinamen. Bought water of the Scotch Gulch company." Question — "Well, was it used there at any time when you were there, — the water?" Answer — "Yes, sir." Question — "Well, why didn't you go and get it?" Answer — "Why, they had a right to sell the water; I couldn't have stopped them." Question — "Was it your understanding their right was superior to yours?" Answer — "Yes, sir." Question — "Did you recognize the right of the Scotch Gulch company to carry their water around you?" Answer — "I did." This evidence, taken in connection with the fact that the Wimers have been acquainted with the Scotch Gulch ditch and the management thereof by its owners since eighteen hundred and seventy-seven, as well as their own, is a refutation of the idea that plaintiffs have been misled; and if not misled, no injury could follow. We therefore conclude from the testimony, which we have carefully and critically examined, that there is no ground for invoking the doctrine of equitable estoppel as against defendants. We are satis-

fied that at the time of the commencement of this suit, and prior thereto, defendants were carrying no greater amount of water below Scotch Gulch by means of their reconstructed ditch than they were entitled to carry under their appropriation as its conditions prevailed at that time, and hence the injunction was correctly dissolved and the complaint dismissed.    AFFIRMED.