## TURNER *v.* COLE.

(49 Pac. 971.)

1. WATER RIGHT AN APPURTENANCE.—The right to water for irrigation,
   when appurtenant to land, passes by a grant of the land, though not
   specially mentioned: *Simmons* v. *Winters*, 21 Or. 35, and *Hindman* v.
   *Rizor*, 21 Or. 112, applied.

2. NONUSER—ABANDONMENT.—The mere nonuser for a single season of an
   appurtenant water right does not constitute an abandonment. One of
   the essentials of that result is an intention to relinquish, which is not
   shown in this case: *Wimer* v. *Simmons*, 27 Or. 1, approved.

From Malheur: ROBERT EAKIN, Judge.

Suit by A. W. Turner and another against J. L.
Cole and others to determine the rights of the respec-
tive parties to certain running waters. There was a
decree for Turner, from which all parties appeal.

MODIFIED.

For plaintiffs there was a brief and an oral argument by *Messrs. J. L. Rand* and *John J. Balleray.*

For defendants there was a brief over the name of *Cox, Cotton, Teal & Minor,* with an oral argument by *Mr. Lewis B. Cox.*

Opinion by MR. JUSTICE WOLVERTON.

The purpose of this suit is to determine the priority of conflicting water rights as between Turner, one of the plaintiffs, and the defendants Cole and Kendall, and C. J. Gray. The plaintiff claims to have acquired his right by appropriation and use of the waters of Willow Creek, diverted therefrom by means of two ditches, which tap the creek, one upon each side, in the southeast quarter of section ten, township sixteen south, range forty-three east, in Malheur County. Willow Creek runs in a southeasterly course, and these ditches are so constructed that they encompass upon the north, east, and west the principal portion of plaintiff's lands. Within their compass are found, also, some road lands used by plaintiff, and adjoining his. The ditch through which Gray claims his appropriation taps said creek about one and a half miles above those of plaintiff, and the Cole and Kendall ditch some eight miles above. The questions to be considered are almost exclusively of fact, and, there being much conflict in the testimony, no good purpose can be served by attempting to harmonize it, and hence we will briefly state our conclusions without comment thereon.

Turner is now the owner of the southeast quarter

of section ten, the northwest quarter and the north-
east quarter of the southwest quarter of section four-
teen, township sixteen south, range forty-three east.
His title thereto comes through mesne conveyances,
the southeast quarter of section ten from Jonathan
Keeney, the northwest quarter of the northwest quar-
ter of section fourteen from John A. Garvin, and the
remainder from Edward W. Imbler, all of whom ac-
quired from the government. Early in 1871, Fred
Cable and Edward Price were settlers upon the tracts
subsequently acquired by Keeney and Imbler, and the
plaintiff was a settler upon a tract of one hundred and
twenty acres lying to the south and adjoining the
Imbler tract. In March of that year Cable, Price, and
Turner commenced the construction of the plaintiff's
ditches, and upon their completion, probably in June
following, diverted the water from Willow Creek. By
agreement each was to have a joint interest in the
ditches and in the appropriation to be made thereby.
The purpose for which the diversion was made is evi-
denced by a notice, signed by Price, bearing date
April 3, 1871, and recorded in the county clerk's
office at Baker City, May 6, 1871, whereby he claimed
one thousand two hundred inches of water, to run in
a ditch then being constructed by him, for irrigating
purposes. It is not claimed, however, that more than
five hundred inches of water were diverted or appro-
priated, and the plaintiff claims to have secured an
appropriation of two-thirds thereof. It is clear that
there was a diversion of water through these ditches
prior to any appropriation by either of the defend-
ants. The evidence does not establish any con-

tractual relations between Cable and Keeney, either directly or indirectly, touching his settler's rights in the southeast quarter of section ten, and it is not apparent that Keeney ever acquired such rights from Cable. The testimony furnishes but a bare intimation that such was the case. Mr. Imbler was asked: "Do you know how much hay was cut on the place owned by Cable, and afterwards sold by him to Keeney?" to which he replied: "No, sir; after Keeney got it, he cut quite a lot of hay." This is all the reference that is made to such a sale, and the answer does not establish anything regarding it. So that, in so far as the Cable appropriation is concerned, and that which is claimed to be appurtenant to the tract then occupied by him, there is a complete failure of proof by which to establish title in the plaintiff reaching back to the inception of the alleged right, and this disposes of one-half of the appropriation which he is now seeking to establish.

1. As between Price and Imbler it is very satisfactorily shown that Imbler purchased the former settler's rights, and acquired from him a transfer of possession, which would carry with it whatever water appropriation was appurtenant thereto: *Hindman* v. *Rizor*, 21 Or. 112 (27 Pac. 13). The several deeds through which the plaintiff connects his title with that of Imbler make no special mention of the appropriation of any water right acquired through these ditches; but, if appurtenant to the land, it would pass with the grant in general terms: *Simmons* v. *Winters*, 21 Or. 35 (28 Am. St. Rep. 727, 27 Pac. 7). The Price or Imbler tract consists of one hundred and sixty

acres, and, from what we can gather from the testimony as it comes to us, very nearly all of it lies under these ditches, and is susceptible of irrigation therefrom. In its wild state the land produced native grasses, principally what is known in that section of the country as "blue joint," "red top," and "rye grass." These grow upon low lands, where the water overflows in the late spring and early summer, in such abundance that they are cut for hay and fed to stock in the winter season. During the time that Imbler occupied the land, from 1872 to 1876, he sowed six or eight acres of timothy, since which time other tame grasses have been sown, until at the present time it produces principally timothy, red top, and alfalfa, and these are matured and cut for hay. The ditches have been utilized as a means of constructing a fence, for drainage, and for irrigation; but there is much conflict in the testimony touching the real purpose for which they were originally constructed. We think it has been shown, however, that drainage was necessary to good husbandry in the first instance, so as to control the water supply, but after that was accomplished the use of the water was as necessary to the production of the hay crop as before, and was supplied by means of the ditches. Mr. Reeves, a very intelligent witness, says, touching the land at the time Price lived on it: "There was a portion of the Price land, and a good deal other of Willow Creek meadow land, that needed more draining than irrigation, but after you drained it, and turred this water off, by turning it on again it would produce more hay." Now, ever since the construction

of these ditches the water has been utilized through
them, for the irrigation of these meadow lands, with
possibly an exception of a year now and then.   The
grasses have also been improved by supplanting them
in a great measure with tame varieties, so that the
production of hay from these premises has grown into
a valuable industry.   The water has also been put to
other uses upon this land by means of said ditches.
It has been used for irrigating gardens, for producing
small quantities of grain, and for stock and domestic
purposes; and we think there has been an appropria-
tion of water through and by means of these ditches
for a beneficial use that is appurtenant to the lands
settled by Price, and afterwards patented to Imbler,
and that such appropriation relates to the time of their
construction.   The extent of the appropriation must
be determined by the quantity of water used, and the
time of its use, as it is the policy of the law that none
shall be permitted to go to waste when it can be ap-
propriated for a beneficial purpose elsewhere.   The
season during which these meadow lands are irrigated
begins in April or May, and terminates the latter part
of June or the first day of July; and from a concensus
of the testimony we find that they do not require the
full supply needful for the production of crops upon
the higher and drier lands in the vicinity, yet a sub-
stantial amount is necessary to a successful use there-
of.   During the remaining summer and fall months,
however, there is less use for water for irrigation and
domestic purposes.   In view of these considerations,
we think the plaintiff is entitled to an appropriation
of one hundred inches of water from Willow Creek

from the first of April to the middle of July, and fifty inches thereafter, prior in time and superior in right to any appropriation of the defendants.

2. It is contended that there was an abandonment by plaintiff's predecessors of this appropriation, and stress is laid upon the testimony of Glenn, who says, "I did not buy any water right, nor sell any, and knew nothing about any such right," and on Lockett, who says, "I did not buy any water right, did not claim any, and did not sell any." Glenn was the administrator of the estate of Jonathan Keeney from September, 1878, until some time in the winter of 1879, but aside from this, never owned or possessed any interest in the lands, nor did he claim any, except that he says he traded Mr. Imbler a claim on the Owyhee River for his place on Willow Creek, and had Imbler make his deed direct to Keeney. He testifies that, while he was such administrator, he superintended the management of the place, and that he made no use of the water during that time. The title of the land passed by deed from the Keeney heirs to Lockett, and not by administrator's deed. Glenn was without power or authority to relinquish or abandon the appropriation appurtenant thereto by a simple disclaimer of title, and his nonuser of the water for the short time he was in possession did not operate as an abandonment. Lockett bought the land in November, 1879, and sold it in January or February, 1880. He never had occasion to crop it, or to irrigate it, and what he now says pertains to his understanding of what he acquired and held by his deed, and what he transferred to his successor. There was no attempt made by him to relin-

quish any appropriation appurtenant to the land, nor does it appear that he ever had any such intention while in the ownership, without which "there can be no abandonment": *Wimer* v. *Simmons,* 27 Or. 1 (50 Am. St. Rep. 682, 39 Pac. 6). Nor can such intent be inferred from the acts of Lockett while he owned the land. The acts of Glenn and Lockett do not constitute an abandonment, and the testimony, aside from theirs, tending to show nonuser from time to time is insufficient to establish it. We have very carefully examined the testimony touching the prior appropriation claimed by the defendants, and we believe the findings of the court below are in accord therewith. The decree will be modified as indicated by this opinion.

Modified.