Argued April 6; decided June 29, 1896

## NEVADA DITCH CO. v. BENNETT.*
(45 Pac. 472.)

1. PLEADING—RIGHTS OF DEFENDANTS AGAINST EACH OTHER.—In a suit to determine plaintiff's rights to certain property, and to restrain defendants from interfering therewith, the rights of defendants, as between themselves, are *not subject to determination*, except so far as, between themselves, they have tendered and joined hostile issues.

* NOTE.—The Abandonment or Loss of Rights of Prior Appropriators of Water on the Public Domain is the subject of annotation to the case of *Hewitt* v. *Story*, 30 L. R. A. 265; on which subject see also note to *Wimer* v. *Simmons*, 50 Am. St. 700; and with *McGuire* v. *Brown*, 30 L. R. A. 384, is a note collecting many authorities on the Change of Use or Channel of Appropriated Water. There is also a note with *Strickler* v. *City of Colorado Springs*, 25 Am. St. Rep. 245, on Changing the Point of Diversion of Water, and the Washington case of *Isaacs* v.

2. Reasonable Diligence in Appropriating Water.—In the early summer of 1881, persons claiming an appropriation of water from a public stream posted a notice at the head of the proposed ditch, as required by local custom, stating the amount of water claimed, the purposes for which it was to be applied, and the route and terminals. Work was begun shortly afterwards, and a dam was built and a diversion made for the purpose of aiding in the excavation. The first section, two miles long, was completed in the spring of 1882. During 1882 the ground was cleared for the excavation of the second section to the further terminal. In the spring of 1883 the work was prosecuted till the irrigating season, when it was stopped to permit the use of water through the completed portion. It was resumed in the fall, and continued till the completion of the second section, in the spring of 1884; and during that year water was run through the full length of the two sections —nine miles—and used for irrigation purposes. *Held*, that the claimants, who were pioneers, and of limited means and facilities, exercised due and reasonable diligence in the prosecution of the work.

3. Date of Appropriation by Relation[2]—Notice.—The appropriation of the water of a stream running through the public domain, initiated by the posting and recording of a notice in accordance with a custom, and perfected by a diversion and application of the water to beneficial uses within a reasonable time, dates back, under the doctrine of relation, to the first step taken.

4. "Appropriation" of Water Defined.—A claim to the waters of a stream does not become an "appropriation" until there is an actual application of the water claimed to some beneficial purpose. There is no such thing as a constructive appropriation, nor can any step in the course of perfecting the claim be accomplished except by a genuine physical performance of it.

5. Limit of Appropriation.—An appropriation of water from a stream is in every instance limited to the quantity needed to accomplish the beneficial purpose for which the diversion was made: *Simmons* v. *Winters,* 21 Or. 35, cited and approved.

6. Reasonable Diligence in Making Appropriation.—An appropriator of water from a stream is entitled to a reasonable time after he has diverted and carried the water to the place of use, in which to make the actual application to the contemplated useful purpose: *Hindman* v. *Rizor,* 21 Or. 112; and *Cole* v. *Logan,* 24 Or. 304, approved and followed.

7. Transfer of Incomplete Water Right—Appurtenance.—Where a person who has initiated but not perfected a water appropriation conveys his interest in the land to which the water right is appurtenant, the right so initiated passes with the land, and the successor can complete the appropriation.

*Barber,* 30 L. R. A. 665, has a very exhaustive compilation of authorities on the Right of Prior Appropriation of Water, both at common law, and under special statutes or customs. With the case of *Combs* v. *Agricultural Ditch Co.,* 31 Am. St. Rep. 283, are annotations on the Rights of Prior Appropriators of Water, and For What Purposes Water May Be Diverted.—Reporter.

[2] On this question see also *Cole* v. *Logan,* 24 Or. 304.—Reporter.

8. Transfer of Completed Water Right.—A sale or transfer of the whole or part of a completed appropriation of water may be made, either in connection with or separate and apart from the land in connection with which the water was originally used; and the purchaser may use it for an entirely different and distinct purpose from the one originally intended.

9. Extension of Beneficial Use.—The bona fide intention to devote the water to a useful purpose, which is required of an appropriator, may comprehend a use to be made by or through other persons, and upon lands and possessions other than those of the appropriator: *Simmons* v. *Winters,* 21 Or. 35, distinguished.

10. Reasonable Diligence in Application of Appropriation.— Persons contemplating a use, not only to be applied by themselves, but by such others as might come in, claimed an appropriation of water over public lands. They sought to induce immigration by diverting the water, and carrying it to such localities as would be convenient for use. They completed the ditch with reasonable diligence, and, within a year thereafter, users were ready and willing, with sufficient lands to absorb the appropriation by application to a beneficial use. *Held,* that there was sufficient diligence in the application of the use to prevent the appropriation from lapsing.

11. Appropriation of Waters by Government on Public Lands.— Non-navigable streams upon the public domain, not appropriated by the methods cognizant to law, are as much the property of the government as the lands through which they flow, and may be taken and used by the government without any of the steps required of private citizens; but such rights cease whenever the land passes to a private individual or is restored to the public domain, unless there is a special grant continuing the government rights to the grantee.

12. When Water Right Is Not Appurtenant to Public Lands.— A public use of water from a public stream by the government does not become appurtenant to the soil, so as to pass with it in a grant to private individuals, so as to give the patentee a right of appropriation superior to that of one who perfected an appropriation before the issuance of the patent, but after the diversion of the water by the government.

13. Idem.—Even if the public use of water, made by the government upon the public domain, would pass as appurtenant to the land under an ordinary patent, so as to render the rights of the patentee superior to those of one who had perfected an -appropriation before the issuing of the patent, such rights would not pass under a patent in which the grant is expressly made subject to vested and accrued water rights.

From Malheur:   Morton D. Clifford, Judge.

This is a suit instituted August 15, 1893, for the purpose of establishing the date and extent of plaintiff's appropriation of water from the Malheur River, in Mal-

heur County, Oregon, and to enjoin the several defendants from in any way using the waters of said stream so as to interfere with the full and free use of its appropriation. The Malheur River is a perennial, non-navigable stream, taking its rise in Harney County, Oregon, having for its tributaries what are known as the North Fork and Middle Fork of the Malheur River. Its general course is north-easterly across the County of Malheur until it empties in the Snake River. The Malheur valley contains a large body of arid lands, but arable and productive with the use of water. Above the main valley are to be found several small valleys, subject to irrigation from the river or its tributaries. These lands, in their natural state, are generally covered with a growth of sage brush, and what native grasses, the most prevalent being the bunch grass; but in many places upon the lower lands, and especially where water is wont to stand until spring, there is pro-duced a native grass commonly known as rye grass, and at other places native grassses of different kinds are pro-duced with moisture in such abundance as that it may be cut and cured for hay, and is extensively used as feed for stock. The plaintiff's ditch is the lowest on the river, mak-ing its diversion from the left bank in section 21, Tp. 18 S., R. 45 E. Then follow the defendants' ditches in the order of their points of diversion: First, the Sand Hollow Company's ditch, taking its water from the left bank in sec-tion 15, Tp. 19 S., R. 44 E.; second, the Gillerman-Froman ditch, with point of diversion at the right bank in section 8 of same township; third, the Eastman Brothers & Bal-lentine ditch, diverting from left bank in section 3, Tp. 19 S., R. 43 E.; fourth, the Malheur Farmers' Irrigating Company's ditch, diverting from the right bank in section 33, Tp. 18 S., R. 44 E. Above these come in their order the Pacific Live Stock Company's ditches, four in number: First, the Harper's Ranch ditch, diverting from the left

bank of the main stream in section 13, Tp. 20 S., R. 41 E.; second, the Warm Spring Valley ditch, with point of diversion from left bank of the Middle Fork, in section 13, Tp. 22 S., R. 36 E.; and third, the "Agency ditch west," and "Agency ditch east," the former diverting from the left bank and the latter from the right bank of the North Fork of the Malheur River, both in the NE. $\frac{1}{4}$ of section 4, Tp. 19 S., R. 37 E.   There are other ditches, but they belong to parties who have defaulted.

The defendants, the Sand Hollow Ditch Company, Eastman Brothers & Ballentine, the Malheur Farmers' Irrigating Ditch Company, and the Pacific Live Stock Company, by their several answers put in issue the material allegations of the complaint touching appropriation, use, priority, etc., and for further and separate defenses set up their several appropriations, claiming priority therefor as to plaintiff, and pray that the complaint be dismissed, and for costs and disbursements. The Gillerman-Froman Ditch Company interposed a like answer, with the additional allegation that its appropriation is not only prior in point of time to that of plaintiff, but is also prior and superior to any claim of appropriation of any of the other defendants, and prays that their appropriation be established and declared prior and superior to all others. The cause was referred to the Hon. Stephen A. Lowell to take the testimony and report his findings of fact and law, and the decree is based entirely upon his findings, except in so far as it relates to the amount of plaintiff's earlier appropriation. In settling the priority of appropriations it declares that the Pacific Live Stock Company is entitled to the first through its agency ditches to the extent of 750 inches miner's measurement; that plaintiff has the second of 885 inches, and that the appropriations through all the other ditches mentioned are subordinate to these appropriations; that in 1888 plaintiff's appropria-

tion was increased to 3,037 inches, but that as to the
increase it has priority over the Pacific Live Stock Com-
pany's Warm Spring Valley ditch only.  The decree en-
joins the diversion of water, except as in accord with the
rights of the parties thereby ascertained.  From this
decree the plaintiffs, the Gillerman-Froman Ditch Com-
pany and the Sand Hollow Ditch Company, appeal.  The
respondents objected in the lower court to any decree
determining the priorities as between themselves.

*The Nevada Ditch Appropriation.*—In the early summer
of 1881, C. W. Mallett, I. H. Adams, and W. R. Lee came
into the State of Oregon, from Nevada, in search of homes
for themselves and families, expecting to settle upon gov-
ernment lands, with the purpose of finally acquiring title
thereto.  Having come upon the arid lands of the Malheur
Valley, they conceived a scheme of constructing a ditch
through which to provide water for the irrigation of such
lands accessible thereto as they and others should take
up, all the lands of the valley being then vacant and sub-
ject to settlement, except such as had been selected by the
Willamette Valley & Cascade Mountain Wagon Road
Company.  They were impressed with the idea that they
could each acquire from the government a section and a
half of land, under laws providing for the sale and dis-
position of the public domain.  The scheme comprehended
an early settlement of that particular portion of the valley,
and the upbuilding of a reasonably populous farming com-
munity.  Other home seekers were even then depending
in a great measure upon their judgment in the selection
of suitable locations for future habitation.  So that, in
view of these considerations, Mallett, Adams, and Lee
determined to construct the contemplated ditch, and, in
pursuance of such determination, on July 12, 1881, posted
a notice at the point of their intended diversion, claiming
an appropriation of 8,000 inches of the water of Malheur

River for agricultural and milling purposes, giving generally the route and terminals of the proposed ditch, and, as soon thereafter as practicable, caused a duplicate of the notice to be filed and recorded in the county clerk's office of the proper county.   Prior to posting the notice the parties had run a preliminary line of survey along the proposed route, to demonstrate its feasibility, and had each located a section and a half of land under the ditch, with a view of acquiring title thereto; but eventually Mallett acquired title from the government to only one-half of section 20, Tp. 18 S., R. 46 E., and Adams to one-half of section 24, in Tp. 18 S., R. 45 E., but Lee never acquired title to any of the lands so located by him.   Within a few days after the posting of said notice, one G. W. Blanton, with his family, including two sons, James and John, visited the valley, and, being desirous of settling therein, applied to Mallett, Adams, and Lee for an interest in their appropriation, and thereupon bargained for a one-fourth interest; and soon thereafter, on July 21, 1881, they all four entered into a mutual agreement whereby it was provided that Mallett should construct the first section, or about two miles of the ditch, in consideration of $2,400, each to contribute in money or labor to the extent of one-fourth thereof, and that in case either should fail to so contribute his full proportion, he should forfeit his interest in the ditch to such of the others as should complete it. The agreement was reduced to writing, but, by an oversight, was signed only Mallett, Adams, and Lee.   Blanton, however, in March, 1885, after the completion of the ditch, received a deed from the parties so signing the agreement to a one-fourth interest therein.

A permanent survey was provided for, and accordingly made by one C. M. Foster, in August, for the distance of about ten miles, commencing at the point of diversion as claimed in the notice; the first section of two miles being

located upon a grade of 3.20 feet to the mile, and the remaining or second section upon a grade of 2.16. The ditch was subsequently constructed practically upon this line of survey. Mallett and Blanton, with others to help them, began work in the construction of the ditch soon after the permanent survey made by Foster. Adams and Lee in the meantime had gone to Nevada for their families, and in November the former returned. Lee did not return, but one J. A. Walters came, by arrangement with him, to erect a house upon his located land, and to assist in his stead with the construction of the ditch. Prior to his departure Lee paid Mallett $60, to be applied in part payment of his share of the expense of construction. By this time C. H. Brown, a friend of Mallett's, between whom there had been a previous understanding in regard to removing to the valley, should a suitable locality be found, had come to establish a home in the vicinity. Thenceforth Mallett, Adams, Blanton, and Brown pushed the work of construction throughout the winter, as the weather would permit. In the spring these parties were joined in their work by Walters and others, to wit: J. C. Arnold, T. W. Halliday, and J. H. Chandler, who had all come from Nevada, by arrangement either with Lee or Adams, with a view to settling under the ditch, and later in the spring the first or two-mile section was completed. In the fall the way was cleared for the second section, which consisted in grubbing out the sagebrush and other shrubs, and putting the land in condition for the plow and scraper. This section is a little over six miles in length, and terminates at what is known as the Dunbar Place or tap. In the spring of 1883 they began the work of excavation upon this last section of the ditch, and continued without intermission, except to permit the use of water during the season for irrigating purposes, into the spring of 1884, when it was completed and accepted. As to this

there is some disagreement among the witnesses; some say that a little work, cleaning out the ditch at a place or two along the line, was done in the spring of 1885, and that the section was not accepted as completed by a committee appointed for that purpose until that time; but they all concur that it was practically completed in 1884. Walton, and perhaps Arnold, worked in the interest of Lee for about a month in the spring of 1882, while the first section was in process of construction; and thereafter Lee failed to contribute anything toward the expense of construction, and thereupon Mallett assumed and discharged his liabilities, and assumed the ownership of his interest in the ditch, in accordance with the stipulations of the agreement entered into prior to Lee's departure for Nevada. This interest Mallett subsequently treated as his own, and disposed of subdivided portions thereof from time to time by deed as opportunity offered.

*Morfitt Extension.*—In September, 1883, one William Morfitt acquired an interest in the ditch, and by verbal agreement for the promoters thereof, extended it some four miles in an easterly direction, at his own expense, stipulating to convey the extension to the promoters at any time that they saw fit to pay him the cost of construction. This extension was completed in 1884, some say concurrent in time with the completion of the last section of the original ditch, and others soon after, in the fall of 1884, or the spring of 1885.

*Danielson Extension.*—In 1885 one Minnie J. Danielson also acquired of the original promoters an interest in the ditch, and, by an agreement with them like that with Morfitt, constructed upon her own account an extension of some six miles of ditch, commencing at the lower termini of the Morfitt extension, and running almost due south, which was completed and water passed through it in 1886. In 1888 the head of the ditch was changed to a

point about three-fourths of a mile above the original point of diversion, and the entire ditch was cleaned out and enlarged so that it would carry an increased flow of water.

Thus was constructed the entire ditch. Through conveyances subsequently made by all the parties holding interests in the ditch, and the appropriation of water made through its instrumentality, the Nevada Ditch Company, the plaintiff herein, has acquired the ownership thereof. The stockholders in said company claim to be entitled to the use of the appropriation in proportion to the amount of stock held by each. Some of them are using the water upon lands owned and cultivated individually, and others are renting to parties having no interest in the Nevada Ditch Company; but generally the water is being used for agricultural purposes. Since the year 1886, the year 1894 excepted, plaintiff's water supply has been cut short by reason of the use made of it above its ditch by the defendants. The present capacity of the ditch in the first, or three-twenty, section is 10,353 inches, and in the second 3,037 inches, miner's measurement. Water was first turned in during September, 1881, which was used in its construction, and was first used for irrigation purposes in 1883. During the season from fifty to sixty acres of land were irrigated, and in the year 1884 two or three times as much water was used for like purposes. From this time on lands were rapidly reduced to cultivation, and in 1886 there appears to have been use made of all the water the ditch was capable of carrying. As shown by the record of deeds, Cambridge Arnold, T. W. Halliday, J. H. Chandler, J. A. Walter, C. H. Brown, David Dunbar, Daniel Smith, William Morfitt, and Mary Richardson all acquired an interest in the ditch in 1883. James W. Virtue acquired an interest in 1884, A. McGregor and Minnie J. Danielson (successor to Chas. Howard) in 1885, and F. R. Coffin, J. L. Cole, and James Richardson in 1886. Many of these

persons bargained for their respective interests some time
before procuring the deeds. Besides these, it is in evi-
dence that James Blanton, John Blanton, and J. W. Green
held interests in the ditch in 1883, so that, including the
original promoters, Mallett, Adams, and G. W. Blanton,
there were fifteen persons possessing subdivided interests
in the ditch in 1883, to which number was added one in
1884, three in 1885, and three in 1886, making twenty-
two in all. I. H. Adams, C. W. Mallett, C. H. Brown, T.
W. Halliday, J. C. Arnold, and J. W. Green, all of whom
held claims under the ditch, began the use of water for
irrigation purposes in 1883. The following named per-
sons, having claims under the ditch at the time, began the
use of water, to wit: Daniel Smith, James Richardson,
James W. Virtue, G. W. Blanton, J. L. Cole, and A.
McGregor in 1884; David Dunbar in 1885, and J. A. Mor-
ton, A. Draper, Frank Draper, A. Darr, Joe Darr, G. W.
Smith, G. W. Long, John Blanton, James Blanton, either
in 1884 or 1885, the time is not definitely fixed. J. A.
Walter used in 1886, and there is some evidence tending
to show that Minnie J. Danielson used the same year.
Comprehending all these, there should have been twenty-
four users of water during the years named. William
Morfitt never used; James and Mary Richardson, Daniel
Smith, and James W. Virtue made a temporary use for the
purpose of proving up on their desert claims, since which
time, about 1885, they have allowed their claims to lay
idle, but have leased the use as they could, and the evi-
dence tends to show that Minnie J. Danielson used in
the same manner, and for a like purpose; but there is some
testimony to the effect that she used for agricultural
purposes, and has since, in conjunction with Keisel and
Shilling, reduced to cultivation by its use some 400 acres.

There is no data by which it may be ascertained what
amount of land she claimed under the ditch at the time

she began its use, or what progress she made in reducing the same to cultivation, or what beneficial application she made of the water. Those having claims under the ditch who began to use the water in 1883 have brought into cultivation prior to the commencement of this suit 1,010 acres, to wit: Chandler, 40 acres; Mallett, 310; Adams, 310; Brown, 160; Halliday, 80; and Green, 110. Those who began using in 1884, 390 acres, to wit: Wilson Improvement Company, who purchased of Long, 100 acres; John Blanton, 25; G. W. Blanton, 120; James Blanton, 50; and A. McGregor, 95. Those of 1884 or 1885, 183 acres, to wit: Darr, 70 acres; Dunbar, 100; and Smith 13; aggregating 1,583 acres. Aside from this, Walters acquired an interest in the ditch in 1883, entered 160 acres under the ditch the same year, and began the use of water in 1886. All this tract appears to have been reduced to cultivation, and now stands in the name of Steel, and it is probable that Minnie J. Danielson, who possibly began the use in 1886, has reduced to cultivation a portion of her then holdings, but as to this the proof is very indefinite. There are others who had claims under the ditch, and began the use as early as 1883 and 1884, but it is difficult to ascertain from the evidence who succeeded them, and what amount of land has been reclaimed by them. As an instance, Arnold held a claim, owned an interest in the ditch, and began the use of water in 1883, and it is in evidence that there is now sixty acres in cultivation upon this ranch, but it does not appear who succeeded him either as to his interest in the land or the ditch, probably J. Morrison. It will be noticed that all the parties herein named who began the early use of water, and who have succeeded in reducing their lands to cultivation, except Minnie J. Danielson, are under the first two sections of the ditch, which ends at the Dunlap Place, or the beginning of the Morfitt extension. There are approximately 1,970

acres irrigated under the first two sections, 320 acres under the Morfitt extension, and 679 under the Danielson extension; but the inception of the use of the water, as it applies to individuals now engaged in irrigation under the two extensions, cannot be traced in a single instance, excepting possibly Minnie J. Danielson, and the same may be said of a small proportion of those using under the main section.

*The Sand Hollow Ditch Appropriation.*—In July, 1885, several persons, viz.: E. L. Willey, Geo. E. Bennett, M. G. Hope, and Truman Conforth, ran a line of survey for a ditch, and in September of the same year they, with other associates, began its construction, and in the spring of 1886 completed the same, and by means thereof made a diversion of water and began the use of it for irrigating purposes. No notice of appropriation was ever posted.

*The Gillerman & Froman Appropriation.*—In December, 1882, Frederick Gillerman, F. K. Froman, Frederick Niehart, William Pennington, and Robert Goff posted a notice on the right bank of the Malheur River, at point of intended diversion, claiming an appropriation of 3,000 inches of water for irrigation purposes, but no record was made of the notice. The point of diversion is at or near a point selected by one L. B. Rinehart in 1877 or 1878, who caused a survey to be made therefrom at that time, with the supposed intention of constructing a ditch, and thereby making a diversion of the water. In June, 1883, these parties began the construction of their ditch, and excavated some 300 yards thereof, extending from the point of diversion easterly to its confluence with an old bed of the river, at which latter point a headgate was constructed, the water turned in through the ditch, and allowed to escape down the old channel, and thence again into the river. This was all accomplished in June. About September 15, 1883, Foster made a survey and location of this ditch, which followed in the main the Rinehart

survey of 1877 or 1878. The ditch was fully constructed and completed in April, 1884, and water turned through it for the first time in volume estimated at from 2,500 to 3,000 inches, and during the irrigating season parties having holdings under it began to use in limited quantities.

*Eastman Bros. & Ballentine Appropriation.*—In 1877 J. D. Osburn, Henry Sherman, and others constructed a small ditch leading from the Malheur River at a point in section 3, Tp. 18 S., R. 43 E., into an old slough, and made use of the water thereof, when the river was high, for the purpose of irrigating wild hay land, and some small tracts bearing grain and vegetables, from 1877 to 1881, inclusive. Sherman was at the time the owner of the tract of land now owned by Eastman Bros. & Ballentine, who succeeded to his interest by regular conveyances, but no water was ever used thereon from said ditch. There is testimony, however, of a verbal sale made by Osburn of his interest in the ditch to Eastman Bros. & Ballentine. This ditch was suffered to fall into decay, and in the year 1882 one McLaughlin and others constructed a ditch upon their own account, which intersected and cut off the old ditch near where it entered said slough, and thereafter, in 1884, Eastman Bros. & Ballentine reopened, repaired and enlarged the old ditch from the river to a point near its intersection with the McLaughlin ditch, and from thence constructed a new ditch to their premises, which was completed in 1885, and water utilized through it.

*The Malheur Farmers' Irrigation Ditch Company's Appropriation.*—About the 15th of September, 1883, W. G. Thompson and others procured a survey of a site to be made, about seven miles in length, and in the month of October began the work of construction of a ditch, which they continued until completed, in 1885, the entire length of the surveyed site, and thereby diverted the water and began the use of it for irrigating purposes. In November,

1880, J. D. Osburn had a survey run for a ditch commencing at a point near the head of the Malheur Farmers' Irrigating Ditch Company's ditch, and continuing upon nearly the same line that Thompson had surveyed in September, 1883; but he at no time entered upon the actual work of construction, and posted no notice of his intended appropriation. Later in the year 1880 Osburn procured another survey to be made, commencing about a mile and a half above the head of the Malheur Farmers" ditch, and running thence down the river to its intersection, near the head of said ditch, with the Thompson line of survey, thence continuing in about the course of the Thompson survey throughout its entire length. At the head of this survey Osburn and his partner Lineberger posted a notice claiming an appropriation of 5,000 inches of water, had the same recorded, and in the years 1880, 1881, and 1882 excavated a small section near the head, but made no diversion thereby, or otherwise utilized the same.

*Pacific Live Stock Company's Appropriations.*—The defendant The Pacific Live Stock Company, a corporation formed in January, 1888, is the owner of four different ditches, all diverting water from the Malheur River and its tributaries above the plaintiff's ditch, and all other ditches belonging to the parties to this appeal. The first is known as the Warm Spring Valley ditch, constructed in 1888. No notice of appropriation of water by this ditch was posted or given, and the actual diversion with commencement of use took place in 1889. The second, known as the Harper's Ranch ditch, was constructed between the 20th day of February, 1883, and the 10th day of May, 1884, upon which last-named date actual diversion of water was made, without previous notice thereof. There is no claim that the appropriation through this ditch was made earlier than April, 1883. The two other ditches owned by this company are known as the Agency ditches,

and are more particularly designated as the "Agency ditch east" and "Agency ditch west." The point of diversion of the latter is upon the left bank of the North Fork of the Malheur River, and that of the former is from the right bank of the same fork, and situated in the same quarter section, only a short distance above the latter. A more particular statement of the diversion and the appropriation claimed through the instrumentality of these two Agency ditches is necessary to determine the priorities as between them and the plaintiff's diversion. In the year 1874, sections 3, 4, and 10, Tp. 19 S., R. 37 E., Willamette meridian, was a part of the Malheur Indian Reserve, which had been previously set apart by the government as an Indian agency. At that time, Mr. S. B. Parrish, the agent in charge, caused the route of the "Agency ditch west" to be surveyed, and the ditch constructed from the point of diversion through parts of sections 3 and 4, down past the agency buildings previously erected on section 10. The purpose of constructing the ditch seems to have been to enable the agency farmer to produce hay, vegetables, and cereals for use and consumption in and upon the agency, and to propel certain machinery consisting of a lathe and other mechanical appliances connected with some of the agency buildings, all which were to be and were subsequently utilized in teaching and encouraging the Indians then settled upon the reservation, to the number of some 600, in the arts of civilization and the ways of industry. Under the direction of the agent and the agency farmer there was irrigated, by means of the ditch, from forty to fifty acres of grain, a like amount of wild hay, and some garden, and a portion of the water was used in connection with the mechanical appliances above mentioned. The "Agency ditch east" was constructed under the direction of the Indian agent in charge in 1876. It lies entirely within sections 3 and 4, and was utilized

by the agent and the agency farmer in the irrigation of about 100 acres of land.

About the month of July, 1878, the Indians broke away from the reservation, and engaged in hostilities against the government, but, having been subdued and captured during the remaining summer and early fall, were transferred and taken to other reservations, so that the Malheur Indian Reserve thenceforth ceased to be occupied as an Indian reservation. The government, however, maintained an agent in charge of the buildings and other improvements thereon until the sale and disposal of them with the lands upon which the same were situated. During this interim water was not employed through either of said ditches for any useful purpose, except incidentally by parties living in the agency building, by permission of the agent in charge, and that to a very limited extent. On September 13, 1882, and May 21, 1883, by proclamations of the President of the United States, all the lands of the Reserve, except 320 acres occupied as a military post, were restored to the public domain, and thrown open to occupation and settlement, except the above-mentioned sections 3 and 10. On September 28, 1883, E. L. Bradley, the keeper in charge of the government property at the agency, pre-empted the E. ½ of the SE. ¼, and the SE. ¼ of the NE. ¼, and lot 1 of said section 4, upon which lands the heads of both ditches are located, and later obtained a patent therefor from the United States. Subsequently the Pacific Live Stock Company acquired the title thereto by mesne conveyances from Bradley. During the year 1883 the agency buildings and sections 3 and 10 were disposed of by the general government at public auction, and were purchased by one T. M. Overfelt, for the use and benefit of Overfelt & Company, for about $7,000. On May 19, 1885, a patent was issued to him for the premises, but in April

prior thereto possession was, by special direction of the government, delivered to Overfelt & Company, who at once repaired both these ditches, but in new headgates, and utilized water through them in the season of 1885 for the purpose of irrigation. The Pacific Live Stock Company deraigns title from T. M. Overfelt and Overfelt & Company, and the ditches have been constantly kept in use for irrigation purposes by the said Pacific Live Stock Company and its predecessors since 1885.

MODIFIED.

For the Nevada Ditch Co. there was an oral argument by *Mr. Lewis B. Cox*, with a brief signed by *Messrs. Cox, Cotton, Teal & Minor*, urging these points:

The custom as to appropriation alleged in the complaint is admitted by the respondents Bennett and his associates, the Malheur Farmers' Irrigation Ditch Company, and Eastman Brothers & Ballentine, and is practically admitted by Gillerman and his associates, and it is found by the referee and the trial court from the evidence. As a question of fact, as well as of law, its effect is to fix the rights of an appropriator who posts and files a notice as of the date of his initial step, while one who does not proceed in accordance with the custom takes his rights only from the date of the actual diversion of his water: Black's Pomeroy on Water Rights, § 51; Gould on Waters (2d Ed.), §§ 235-6; Kinney on Irrigation, §§ 157-8, 161-9, 171; *Kimball* v. *Gearhart*, 12 Cal. 27; *De Necochea* v. *Curtis*, 80 Cal. 397; *Welles* v. *Mantes*, 99 Cal. 583; *Woolman* v. *Garringer*, 1 Mont. 535.

When an appropriation has been initiated, the appropriator must commence the construction of his ditch promptly, and prosecute it diligently: *Cole* v. *Logan*, 24 Or. 304; *Ophir Mining Co.* v. *Carpenter*, 4 Nev. 534 (97

Am. Dec. 550); and he may also, within a reasonable time, grade, straighten, or improve the ditch: *White* v. *Todd's Valley Water Co.*, 8 Cal. 443 (68 Am. Dec. 338).

The only requirements for a valid appropriation of water are: First, an intent to apply it to some beneficial use existing at the time or contemplated in the future; second, a diversion from the natural channel by means of a ditch, canal, or other structure; and, third, an application of it within a reasonable time to some useful industry: *Low* v. *Rizor*, 25 Or. 551; *Simmons* v. *Winters*, 21 Or. 35 (28 Am. St. Rep. 727); *Hindman* v. *Rizor*, 21 Or. 112; *Barnes* v. *Sabron*, 10 Nev. 217; *Davis* v. *Gale*, 32 Cal. 26 (91 Am. Dec. 554); Black's Pomeroy on Water Rights, §§ 48-50; Kinney on Irrigation, § 164.

A valid appropriation may be made of a larger amount of water than the appropriator can put to immediate use, and the amount intended for ultimate use will be held in abeyance until needed, if the work of preparing the land for irrigation is prosecuted with diligence: Black's Pomeroy on Water Rights, § 50; Kinney on Irrigation, §§ 238-9; *Cole* v. *Logan*, 24 Or. 304; *Simmons* v. *Winters*, 21 Or. 35 (28 Am. St. Rep. 727); *Moss* v. *Rose*, 27 Or. 595 (41 Pac. 666, 50 Am. St. Rep. 743); *White* v. *Todd's Valley Water Co.*, 8 Cal. 433 (68 Am. Dec. 338); *Ophir Mining Co.* v. *Carpenter*, 4 Nev. 534 (97 Am. Dec. 550); *Barnes* v. *Sabron*, 10 Nev. 217, 243; *Taughenbaugh* v. *Clark* (Colo.), 40 Pac. 153; *Conant* v. *Jones* (Idaho), 32 Pac. 250.

To constitute title by prescription the adverse use must be an invasion of another's rights sufficient to support a suit and must have been continued for a period of ten years: *Union M. & M. Co.* v. *Ferris*, 2 Sawy. 176; *Bird* v. *Dick*, 14 Nev. 161; *Carroll* v. *Gillion*, 33 Ga. 539; *Hathorne* v. *Stinson*, 12 Me. 183 (28 Am. Dec. 167); *Nelson* v. *Butterfield*, 21 Me. 220, 233.

A verbal sale of a possessory right to land will carry

ownership of a ditch appurtenant to the land: *Low* v. *Schaffer*, 24 Or. 239; *Simmons* v. *Winters*, 21 Or. 35 (28 Am. St. Rep. 727); *Hindman* v. *Rizor*, 21 Or. 112.

But a verbal sale of a water right alone works an abandonment: *Low* v. *Schaffer*, 24 Or. 239; *Hindman* v. *Rizor*, 21 Or. 112; *Smith* v. *O'Hara*, 43 Cal. 371; *Barkley* v. *Tieleke*, 2 Mont. 59; *Salina Irr. Co.* v. *Salina Stock Co.*, 7 Utah, 456.

As to the agency ditches, which have been given priority over plaintiff, we submit the following propositions:

(1)  The property rights of the United States in an unnavigable stream flowing across public land are precisely those of an individual as to a similar stream flowing over his lands: *Union Mining Co.* v. *Ferris*, 2 Sawy. 176 (Fed. Cas. No. 14371); Mining Debris Case, 9 Sawy. 492 (18 Fed. 753); *Vansickle* v. *Haines*, 7 Nev. 249; *Lux* v. *Haggin*, 69 Cal. 255.

(2)  Congress has absolute control over the public lands: *Gibson* v. *Choteau*, 80 U. S. 93; *Jourdan* v. *Barrett*, 45 U. S. 168; *McCarty* v. *Mann*, 2 Dill. 441.

(3)  Only the President, or the head of a department, can make a reservation of public lands, and such reservation cannot be inconsistent with an act of Congress: *Grisar* v. *McDowell*, 73 U. S. 363; *Wolsey* v. *Chapman*, 101 U. S. 755; *Wilcox* v. *Jackson*, 38 U. S. 498.

(4)  As to the effect of the severance of the ditch by the President's proclamation, see *Canal Co.* v. *Gordon*, 73 U. S. 561; *Reynolds* v. *Hosmer*, 51 Cal. 205.

(5)  The acts of Congress of 1866 and 1870 (R. S. U. S., §§ 2339, 2340), subject to the appropriation and use of water flowing in unnavigable streams across the public domain to the laws, customs, and decisions of the states in which the streams are found, and the various agencies of the government are as much bound by this policy as are private individuals. The only possible right the United

States could have urged to the water taken through these ditches in 1875 and 1876 was that of a riparian proprietor, which was not transmitted to the Pacific Live Stock Company, and is not the right upon which it relies.    The patents issued in 1885 and 1889 for the lands now irrigated from said ditches expressly save the rights of appropriation by other parties theretofore made.    If the diversions made in 1875 and 1876 had been valid as appropriations, which they were not, they were abandoned and lost in 1878, and the new right dates only from 1885:   Kinney on Irrigation, §§ 145 et seq.

(6)   They were not aided or kept intact by the casual and insignificant uses of the water by private individuals: *Davis* v. *Gale*, 32 Cal. 26 (91 Am. Dec. 554).

For Gillerman, Froman  et al.  there was a brief and an oral argument by *Mr. Thos. H. Crawford*, urging these points:

To make a valid appropriation of water upon the public domain there must be some actual beneficial purpose existing at the time, or contemplated in the near future, for which the water is to be utilized;  and the needs of the use for which the appropriation is made is the limit in every case to the amount of water that may be taken and held: *Simmons* v. *Winters*, 21 Or. 35 (28 Am. St. Rep. 727); *Hindman* v. *Rizor*, 21 Or. 120; *Low* v. *Rizor*, 25 Or. 551; *Weaver* v. *Eureka Lake Co.*, 15 Cal. 271; *Atchison* v. *Peterson*, 87 U. S. 514; *Nichols* v. *McIntosh* (Colo.), 34 Pac. 278; *Perogery* v. *McKissick*, 79 Cal. 572; *Barrows* v. *Fox*, 98 Cal. 63; *Barnes* v. *Sabron*, 10 Nev. 243 (28 Am. & Eng. Enc. Law, 995).

A settler upon the public lands cannot claim and hold, as against subsequent bona fide appropriators, more water than is necessary to irrigate the lands that he has settled

upon and claimed in good faith, and he cannot claim any water to irrigate lands which he neither owns, has possessory title to, or intends to cultivate: *Simmons* v. *Winters,* 21 Or. 35 (28 Am. St. Rep. 727); *Barnes* v. *Sabron,* 10 Nev. 243; *Weaver* v. *Eureka Lake Co.,* 15 Cal. 271; *Orton* v. *Dixon,* 13 Cal. 38; *Kleinschmidt* v. *Greiser,* 14 Mont. 484 (43 Am. St. Rep. 652); *Combs* v. *Agricultural Ditch Co.,* 17 Colo. 146 (31 Am. St. Rep. 275); *Dick* v. *Caldwell,* 14 Nev. 167.

An appropriation of water is not complete until the water is applied to the intended use, and the amount so applied within a reasonable time is the limit of the appropriation, as against subsequent appropriations, and in this respect the grantee's rights obtained from an appropriator, as against subsequent appropriators, can be no greater than those possessed by his grantee at the date of his grant: *Farmers' High Line Canal Co.* v. *Southworth,* 13 Colo. 130 (4 L. R. A. 767); *Schilling* v. *Rominger,* 4 Colo. 100; *Seiber* v. *Frink,* 7 Colo. 149; *Thomas* v. *Guirand,* 6 Colo. 430; *Wheeler* v. *Northern Colo. Irr. Co.,* 10 Colo. 582 (3 Am. St. Rep. 603); *Low* v. *Rizor,* 25 Or. 556; *Hindman* v. *Rizor,* 21 Or. 112; *Cole* v. *Logan,* 24 Or. 304; *Fort Morgan Land Co.* v. *South Platte Ditch Co.,* 18 Colo. 1; Black's Pomeroy on Water Rights, § 48.

Water cannot be appropriated for a speculative purpose, nor can it be acquired by constructive appropriation: 28 Am. & Eng. Enc. Law, 992; *Weaver* v. *Eureka Lake Co.,* 15 Cal. 271; *Dick* v. *Caldwell,* 14 Nev. 167; *Combs* v. *Agricultural Ditch Co.,* 17 Colo. 146 (31 Am. St. Rep. 275); *Eddy* v. *Simpson,* 58 Am. Dec. 408.

An appropriator of water without notice of intention posted or given, and without compliance with local usages or customs, or statutory regulations, gains the right to the water at the time his diversion is fully completed, and then only to the extent and in the manner of such actual

completed diversion: *De Neochea* v. *Curtis,* 80 Cal. 397; *Burrows* v. *Burrows,* 82 Cal. 564; *Well* v. *Mantes,* 90 Cal. 583; *Waterson* v. *Saldunhere,* 101 Cal. 107; *Salazar* v. *Smart,* 12 Mont. 395.

Where a notice has been posted, and such acts done as to give the public notice of having actually commenced work, and of a purpose to diligently prosecute the same until the appropriation is completed, and such notice and acts are followed up diligently by active work until the water is actually diverted and appropriated, the rights of the appropriator relate back to the date of posting notice and beginning active work: *Stark* v. *Barnes,* 4 Cal. 412; *Osgood* v. *Eldorado Water Co.,* 56 Cal. 571; *Kelley* v. *Natorna Water Co.,* 6 Cal. 109; *Sieber* v. *Frink,* 7 Colo. 148; *Ophir Mining Co.* v. *Carpenter,* 4 Nev. 534 (97 Am. Dec. 550); *Conger* v. *Weaver,* 6 Cal. 548 (65 Am. Dec. 528); *Kimball* v. *Gearhart,* 12 Cal. 27.

If the quantity of water actually diverted is no more than is needed for the contemplated use, the appropriator is not compelled to use it all the first year, but has a reasonable time in which to apply the water diverted to the use intended: 28 Am. & Eng. Enc. Law, 995; *Simmons* v. *Winters,* 21 Or. 35 (28 Am. St. Rep. 727); *Conant* v. *Jones* (Idaho), 32 Pac. 250.

The notice posted by Mallett and Adams was for irrigation purposes, and limited the amount of water to the amount needed by them for the beneficial use of irrigating the lands claimed and owned by them, and intended to be cultivated: *McKinney* v. *Smith,* 21 Cal. 374.

The forfeiture by Lee of his rights under the notice could not have the effect of enlarging the rights of Adams or Mallett, and by this means give them a right to more water than they needed for the irrigation of their lands: *Low* v. *Rizor,* 25 Or. 551.

For the Pacific Live Stock Co. there was a brief and an oral argument by *Mr. Chas. W. Parrish.**

For Bennett and the Sand Hollow Ditch Co. there was a brief and an oral argument by *Mr. O. F. Buse.**

For the Malheur Farmers' Irrigation Ditch Co. there was a brief and an oral argument by *Mr. William Smith.**

Mr. Justice Wolverton, after stating the facts in the foregoing language, delivered the opinion of the court.

Before proceeding to the discussion of the questions of vital importance, we will dispose of some that may be regarded as preliminary or incidental only. The defendants all filed demurrers to the complaint, which were general in their nature, and were all overruled by the court below. It is insisted here that the court erred in so doing. The objection is taken upon the theory that plaintiff's complaint comprehends an aggregate of individual appropriations, taking their inceptions at different periods, and that the complaint should have stated facts supporting each individual appropriation, and then the acquirement of them by plaintiff; but the complaint states a single appropriation upon which all the rights claimed are dependent, hence the objection is not well taken.

1. It is next contended by the defendants the Gillerman-Froman people that the especial rights of each of the defendants touching the quantity and priority of their several appropriations should be determined here, as well as plaintiff's, and the correlative rights of all the parties to the suit finally fixed and determined. The point is

* These three parties presented a combined brief, of which a synopsis would have been printed but for the fact that the law argument, extracts from the evidence, and the authorities cited were so inseparably commingled as to make it impossible.—Reporter.

more especially urged as it affects the Gillerman-Froman
people.   The other defendants earnestly object to such a
course, and their objection is based upon the condition of
the pleadings, as well as the course which was pursued in
the court below.   The answer of each of the defendants
controverts the plaintiff's claim, and, in order to show a
prior right to that of plaintiff, each has set up its own claim,
but no defendant has anywhere, by his or its pleading,
assumed to controvert the alleged rights of any of the co-
defendants, and no issue upon the record was ever made
between any of them.   However, the Gillerman-Froman
people have alleged generally that their claim is prior and
superior to all the other defendants, as well as to that of
plaintiff, and they ask affirmative relief.   But this is not
denied by any of their co-defendants, nor would it seem
that any were called upon to do so.   The trial in the
court below seems to have proceeded upon the theory that
there was no contention among co-defendants, and no
countervailing testimony was offered as between them-
selves.   In this state of the record, and by the course of
prior procedure, this court is powerless to determine the
quantity and priority of any appropriations, except as be-
tween plaintiff and the several defendants: *Hargrave* v.
*Cook*, 108 Cal. 72 (41 Pac. 18, 30 L. R. A. 390); Pomeroy
on Code Remedies, § 808.   It would have been much bet-
ter if the rights of all the parties to the controversy could
have been settled and determined in this suit.   Such a
thing could have been accomplished, had the pleadings and
proofs been formulated and directed to that end and pur-
pose; but, without indicating what would be the proper
practice in such cases, let it suffice to say that this case is
not in a condition to apply the remedy demanded.

2.   The plaintiff, by its complaint, claims a single
appropriation of 3,037 miner's inches of the water of the
Malheur River, made as of date July 12, 1881, that being

the date when Mallett, Adams, and Lee posted their notice of appropriation at the original point of diversion through plaintiff's ditch. To sustain the appropriation as of the date named, the doctrine of relation is invoked, it being contended that the promoters of the ditch prosecuted the work of construction with reasonable diligence, and had it fully completed within a reasonable time after the posting of such notice. There can be no question but that they did pursue the work of construction with all the diligence that could reasonably be required of them. The work was commenced in August or September after the posting and recording of their notice, and for the purpose of aiding in the excavation of the first section of upwards of two miles, a dam was constructed at the head of the proposed ditch, and a diversion made. This section was completed as early as the spring of 1882. Prior to the posting of notice a preliminary survey had been run with a triangle, covering, in extent, at least the first section completed; but in August prior to the beginning of the work of construction a permanent survey was made by C. M. Foster, and stakes and monuments set to indicate the route and actual location of the ditch, which was practically followed in the work of construction. This survey is spoken of as being ten miles in length, but the actual length of the ditch from the point of first diversion is something less than nine miles. In the fall of 1882 the way was cleared for the second section, reaching to the eastern terminal of the Foster survey. In the spring its excavation and construction was prosecuted until the irrigating season of that year, when it was discontinued to permit of the use of water through the completed portion of the ditch, by which use from forty to fifty acres of garden and small crops were irrigated during the season. The work of construction was resumed in the fall, and continued until the completion of the second section, in the

spring of 1884. Water was run through the full length of these two sections in the year 1884, and used for irrigating purposes. There is some dispute as to whether the latter section was completed in the spring of 1884, or a year later; but, if not in every detail, it was practically completed in 1884. This shows an exercise of due and reasonable diligence, considering the magnitude of the undertaking, and the circumstances and difficulties usually attending the inception and prosecution of such work in a new country by pioneers with limited means and facilities: *Kimball* v. *Gearhart*, 12 Cal. 28.

3. It was sought to prove the existence of a custom, which it is alleged prevailed in that section of the country, whereby parties seeking to make an appropriation of water for agricultural or beneficial purposes were required to post at the point of diversion a notice containing in substance a statement of the amount of water claimed, the purposes to which it was to be applied, the names of the appropriators, the general direction of the proposed ditch, and the terminals thereof, and have the same immediately recorded in the office of the county clerk or the proper recording officer of the county in which the appropriation was sought to be made. The existence of such a custom is combatted by some of the defendants, and by others it is admitted, but in a qualified sense. By the latter it is claimed that the recording of the notice was not required. The referee found that the custom did exist at the time of the inception of each and every of the water appropriations involved in the controversy, to the full extent, as stated above, and in this he is supported by the evidence. Under these conditions the plaintiff's appropriation would relate back to the date of posting the notice by Mallett, Adams, and Lee, July 12, 1881; certainly to the date of their commencing the construction of the ditch, which was either in August or September following. The rule

seems to be that where notice is required, and one is given, and thereafter the work necessary and requisite to secure a diversion for a beneficial use is begun in good faith, and prosecuted with due and reasonable diligence until completed, and actual diversion made, the appropriation relates back to the first step taken.   The authorities are somewhat in conflict as to what constitutes the first step, whether the posting of the notice, or the actual commencement of work: *Cole* v. *Logan*, 24 Or. at page 309 (33 Pac. 568); Kinney on Irrigation, § 168; *Woolman* v. *Garringer*, 1 Mont. 535.   If, however, there has been an unreasonable delay in carrying forward the work of construction, and the works and appliances necessary to a diversion for the useful purpose intended are not completed within such time as reasonable diligence would require, the appropriation is considered by Mr. Black as beginning with the date of actual diversion, and by Mr. Kinney when the appropriation is fully completed: Black's Pomeroy on Water Rights, § 55; Kinney on Irrigation, § 161.   But whether the one or the other of these authorities should be followed does not become material for us to determine.

It is not seriously contended that the plaintiff's appropriation is invalid, but that it should be confined as to quantity and priority to the rights acquired by Mallett and Adams, which would accord to it an appropriation of from 260 to 500 inches, dating from August or September, 1881, and that any appropriation in excess of this quantity should be recognized only as having been made at the date of actual user for beneficial purposes.   In other words, it is insisted that plaintiff's present appropriation is a conjoined aggregate of lesser appropriations, having their inception at different dates, and that, when traced to their several sources, that only which is personal to Mallett and Adams will antedate the defendants' appropriations, and

that, if thus analyzed, the quantity of the appropriation having priority over those of the defendants will be found to be small, and not to exceed the quantity named. This brings up a question which we have found difficult of solution, and the conclusion at which we have arrived has not been reached without some misgivings. Let us first get a clear idea of the elements which enter into and go to establish a valid appropriation of the waters of a public stream to a beneficial purpose, as we shall be aided by the process, and be the better enabled by the application of analogous cases to the salient features to determine with greater satisfaction the quantity and legal status of the plaintiff's appropriation. The rule is concisely laid down by Mr. Justice MOORE, in *Low* v. *Rizor*, 25 Or. at page 557, that "to constitute a valid appropriation of water three elements must always exist: First, an intent to apply it to some beneficial use, existing at the time or contemplated in the future; second, a diversion from the natural channel by means of a ditch, canal, or other structure; and, third, an application of it within a reasonable time to some useful industry." In elaboration of these elements, Mr. Pomeroy says of the first: "The fundamental doctrine is well settled that the appropriation must be made with a bona fide present design or intention of applying the water to some immediate useful or beneficial purpose, or in present bona fide contemplation of a future application of it to such a purpose, by the parties thus appropriating or claiming": Black's Pomeroy on Water Rights, § 48. Mr. Justice LORD, in *Simmons* v. *Winters*, 21 Or. at page 42 (27 Pac. 7, 28 Am. St. Rep. 727), says: "There must be some actual beneficial purpose, existing at the time or contemplated in the future, as the object for which the water is utilized." This language was approved by Chief Justice BEAN in a later case: See *Hindman* v. *Rizor*, 21 Or. at page 120 (27 Pac. 13).

It has been suggested that the intent and the application is a matter personal to the appropriator, and that whatever he purposes to do with the water must be done by himself, and in connection with his own property. From the nature of things, the intent to apply to some present or future contemplated use must rest with the appropriator. It is a mental status which may manifest itself by subsequent declarations and acts, such as posting notice, diverting the water by the building of a dam, the construction of a ditch or other means, and by applying it to the contemplated use. Ordinarily a person may declare his intentions through another, and may act through an agent, and yet the declarations and acts are as much his as if they were the result of his personal and physical application, and unless there is some reason why an appropriator may not invoke the ordinary agencies for the purposes of perfecting his appropriation, he ought not to be denied the right of their employment for such purposes. So far as it may become necessary to construct the necessary appliances to secure the actual diversion of water, and to transport it to the place of use, and even as it concerns the physical application to the use, there can be no doubt of the right to his employment of such agencies. But the purposes of the appropriation must abide with the appropriator, it must be a design of his concoction or adoption, and the use he proposes must be a beneficial one; thus far it is perfectly manifest that the act is personal to himself. So that, taking these propositions as granted, the inquiry is narrowed to the object to which the use must be applied. Must the appropriator be the proprietor of or have an interest in the object in connection with which the water must be utilized, in order to perfect the appropriation, or will it serve the purpose if the water is supplied to some other person, who makes the appropriation in connection with an object in which the appropriator has no interest?

To state the proposition concisely, Can A appropriate water for the purpose of running B's mill, or irrigating his lands, or working his mines, and will such use made of it by B, granting it to be beneficial, inure to the appropriator's benefit, in the process of perfecting his appropriation? For the present, let us consider the other two elements which go to make up a valid appropriation: As the water of a public stream, while flowing in its natural channel, is the property of the public, an individual, if he would obtain a usufructuary interest therein, must lay hold of so much of it as is required for his use; that is, make a diversion whereby he is thereafter enabled to assert absolute control over it. This needs no elucidation. The third element requires an actual user for some beneficial purpose.

4.   The term "appropriation" is often loosely used by the authorities, and in general it is used with reference to a claim to the use of the water of a public stream from the time of the inception of the right, at all the intermediate stages, and down to the time when the last act is accomplished by which the right is finally and completely secured. An appropriation proper is not made until there has been an actual application of the water claimed to some beneficial purpose or some useful industry; all rights acquired prior to this time, at whatsoever step in the process, amount simply to a claim of an appropriation, but they are none the less rights and privileges which may be asserted and maintained against all persons not entitled to priority in rights and privileges of like nature. The Supreme Court of California defines the word "appropriation," in the connection which we are now considering it, as "the intent to take, accompanied by some open physical demonstration of the intent, and for some valuable use": *McDonald* v. *Bear River Min. Co.*, 13 Cal. 233. It is said in *Thomas* v. *Guiraud*, 6 Colo. 533: "The true test of appro-

priation of water is the successful application thereof to the beneficial use designed." In *Larimer County Reservoir Co.* v. *People*, 8 Colo. 614 (9 Pac. 794), HELM, J., in speaking for the court, says: "We are of the opinion that when the individual, by some open, physical demonstration, indicates an intent to take, for a valuable or beneficial use, and through such demonstration ultimately succeeds in applying the water to the use designed, there is such an appropriation as is contemplated by our constitution and statutes." This language was approved, and the doctrine thereby stated adopted in a late case in the same state: See *Fort Morgan Land Co.* v. *South Platte Ditch Co.*, 18 Colo. 1. In *Farmer's High Line Canal Co.* v. *Southworth*, 13 Colo. 115 (21 Pac. 1028, 4 L. R. A. 767), a complaint by which it was sought to establish an appropriation was held insufficient upon demurrer in that it did not allege the application of the water to the plaintiff's lands. So in *Peregoy* v. *McKissick*, 79 Cal. 572 (21 Pac. 967), THORNTON, J., says: "If the plaintiff has never used the water for any useful or beneficial purpose, he was never an appropriator," and in *Low* v. *Rizor*, 25 Or. at page 557 (37 Pac. 82), Mr. Justice MOORE says: "There having been a failure to make the application of the water to the irrigation of the land within a reasonable time, one of the elements of a valid appropriation is lacking, and hence the defendant's claim to a prior appropriation must fail." Mr. Kinney, in his work on Irrigation, § 167, says: "The appropriation becomes perfect only when the ditches or canals are completed, the water diverted from its natural stream or channel, and actually used for beneficial purposes." So that actual user for a beneficial purpose is the true and only final test touching the question whether a party's claim has ripened into a valid appropriation. There can be no constructive appropriation, nor can any step required to be taken throughout the whole project and course of

water appropriations be constructively accomplished.   It
is the actual physical performance of every essential requi-
site, from the time the purpose is definitely conceived
down to the ultimate user of the water in connection with
the advancement of some useful and beneficial industry,
that matures and finally accomplishes the "appropriation."

5.   But this understanding of what it takes to con-
stitute an appropriation does not preclude claimants from
acquiring valuable rights and privileges prior to the time
when such claims ripen into a full or completed appropria-
tion.   There are two periods of gestation, if we may be
allowed the expression:   One concerns the time required,
measured by due and reasonable diligence, for the building
and construction of such works and appliances as may be
necessary and convenient for diverting the water and
carrying it to the place of use (of this we have spoken
heretofore); and the other the time needful to utilize the
water by the actual application of it to the contemplated
beneficial purpose.   The appropriation is in every instance
limited in quantity and quality by the uses for which the
appropriation is made:   *Atchesen* v. *Petersen,* 87 U. S. (20
Wall.) 507.   In *Simmons* v. *Winters,* 21 Or. 35 (28 Am.
St. Rep. 727, 27 Pac. 7), Mr. Justice Lord says "the
amount of water appropriated must be restricted to the
quantity needed for the purpose."   The reason of the rule
is that by nature the water supply is limited in the arid
regions, and habitation is dependent upon its use to make
the earth yield up its precious metals and the soil to bring
forth its fruits in season, hence the restriction of its use to
quantities needed for beneficial purposes, as with such
husbanding of the supply there is yet not sufficient to
meet the increasing demands.

6.   The claimant is entitled to a reasonable time after
he has diverted and carried the water to the place of use
in which to make the actual application to the contem-

plated useful purpose; the prime requirement being that
he must use reasonable diligence in making the applica-
tion, the attendant and surrounding circumstances being
considered. We quote again from Mr. Justice LORD, in
*Simmons* v. *Winters,* at page 42: "If the amount of water
appropriated is within the given beneficial purpose for
which it was taken, no more than is necessary to irrigate
the lands contemplated to be reduced to cultivation as
soon as can reasonably be done, although more than can
be beneficially used for the present, it is nevertheless a
valid appropriation." See also *Hindman* v. *Rizor,* 21 Or.
112 (27 Pac. 13). In *Conant* v. *Jones,* 3 Idaho (32 Pac.
251), the court say: "A person who complies with the
law as to locating and conducting the water to the point
of intended use has such time as he may need or require,
using ordinary diligence in getting his land into cultiva-
tion, to make application of such water to the intended
use; such time, at least, as is reasonable under all the cir-
cumstances of the case." See also *Moss* v. *Rose,* 27 Or.
598 (50 Am. St. Rep. 743, 41 Pac. 666). In this case the
defendant had cleared off sagebrush, and reduced to culti-
vation 100 acres out of 160, during a period of seven years,
and was still engaged in clearing up the balance for the
purpose of agriculture, and it was held, under the circum-
stances surrounding the case, that he was exercising
reasonable diligence. And in *Cole* v. *Logan,* 24 Or. 304
(33 Pac. 568), Mr. Justice MOORE says: "As he (defend-
ant) adds to the area of his cultivated land, he may increase
the amount of his diversion until he has acquired the
quantity necessary to properly irrigate the whole tract,
and any subsequent appropriator diverts the water sub-
ject to such prior claim. To entitle the defendant, how-
ever, to the benefit of such an appropriation, he should,
within a reasonable time, apply the water to such bene-
ficial use. As fast as he can reasonably put his homestead

into cultivation, he is entitled to divert and use the water for that purpose." These authorities are sufficient to show that the proposition is settled in this State.

7.   Now to return to the contemplated use or the object for which the claim of appropriation is made: After a completed appropriation, the appropriator may sell and convey his lands in connection with which the appropriation was made, and the water rights acquired thereby will pass appurtenant to the land. And this is so even where possessory rights to the public lands, the title to which has not yet been acquired from the government, is transferred by delivery of possession without deed or other writing: See *Hindman* v. *Rizor*, 21 Or. 112 (27 Pac. 13), and *Low* v. *Schaffer*, 24 Or. 239 (33 Pac. 678). The ruling under the facts of the former of these cases would seem to imply that if the party who initiated the appropriation had not yet completed it when the transfer of the possessory title to which the water right was appurtenant took place, that his successor would then complete the appropriation. The point, however, was not specially made, but we think it must be conceded that such would be the case. Suppose A is the owner in fee of a tract of land, or of a possessory title thereto, under the government, and initiates a water appropriation for contemplated use for the irrigation of such tract by proper notice, and actual diversion and conveyance to and upon the land, but, before he has a reasonable time in which to apply all the water needed to the use designed, he conveys the land with his water rights thus acquired to B, surely B could complete the appropriation by reducing the remainder of the land to cultivation, and applying the water to the irrigation thereof—that is, to A's contemplated use. In this instance, B, having acquired A's initiative right, makes the application in his stead, but to the object in connection with which A designed the use. Take another case. Sup-

pose A makes a diversion for a contemplated use upon White Acre, which he owns, and afterwards, and before he has completed his appropriation by actual user of all the water of his appropriation needed for the cultivation of White Acre, he purchases Black Acre, of like dimensions, and requiring a like quantity of water for its cultivation, and thereupon he abandons White Acre, and uses the water upon Black Acre; can he thus complete his appropriation? It would seem reasonable that he could, although upon this proposition we have found no adjudicated cases. If such is the case, here is a change of the object in connection with which the use was primarily designed. However, in either case, the object was primarily the property of the appropriator.

8.    After an appropriation is completed, it is settled that there may be a change of the place of use: See *Wimer* v. *Simmons,* 27 Or. 1 (50 Am. St. Rep. 685, 39 Pac. 6). Even a sale or transfer of the whole or a part of the appropriation may then be made, either in connection with or separate and apart from the land, and the purchaser may use it for an entirely different and distinct purpose: *Drake* v. *Earhart,* 2 Idaho, 716 (23 Pac. 541); *Strickler* v. *Colorado Springs,* 16 Colo. 68 (26 Pac. 313, 25 Am. St. Rep. 245).

9.    Mr. Pomeroy, in his work on Water Rights, § 47, as touching the methods by which an appropriation is effected, asserts the following proposition: "The very object of his (the appropriator's) appropriation may be to conduct the water from the stream, through a ditch or canal across the intervening public lands, to the tract which he possesses as a mining claim, a farm, or a mill, or even to sell and dispose of the water thus conducted through the canal to other parties, who use it for like purposes on their own 'claims' or tracts of land." And Mr. Kinney states the proposition in very much the same

language.   See Kinney on Irrigation, § 156.   No authorities are cited in support of the text.   The language here used by the learned authors, that the very object of the appropriation may be to sell and dispose of the water to other parties, who may use it for like purposes on their own claims or tracts, is only reconcilable with the idea that the contemplated use may be for other persons not concerned in the initiation of the appropriation, as they are discussing the methods of appropriation, not of the property rights after a completed appropriation, nor of a sale or disposal of the use while the appropriation is in process of acquirement.   And we have seen that there can be no appropriation without actual application to the contemplated use.   Mr. Kinney, in a succeeding section (§ 171), in a summary of his chapter upon "Methods by which Appropriations of Water may be Made," says: "At the very inception of a valid appropriation of water from a natural stream or lake, there must be a bona fide intention upon the part of the one attempting to appropriate the water to apply the same, when his appropriation is completed, to some of the beneficial or useful purposes." Then, after stating the office of the notice and the necessity of diversion, he says:   "All the water, when so diverted, must be applied to some one of the beneficial or useful purposes."   Mr. Pomeroy is also in accord with this view, although he does not state it so clearly.   In this statement of the rule we find no element which requires the appropriator to make the contemplated use in connection with lands or property of his own, and the rule thus stated is complied with when the appropriator's contemplated use is to work the mines, run the mill or irrigate the land of another.   In *Simmons* v. *Winters,* 21 Or. 35 (28 Am. St. Rep. 727, 27 Pac. 7), Mr. Justice LORD says: "While a settler cannot appropriate more water from the public domain than is necessary to irrigate his

land, nor any to irrigate lands which he does not intend to cultivate, nor own or hold by possessory title," and from this language it is argued that the rule goes farther than as stated by Mr. Kinney, and requires the appropriator to possess or own the lands in connection with which the contemplated use must be wrought out by a physical application thereto of the water claimed, but the language was used with reference to the facts of that particular case. So also language of somewhat similar import was used by HAWLEY, C. J., in *Barnes* v. *Sabron*, 10 Nev. 243, cited in *Simmons* v. *Winters*. In each of these cases the settler was making an appropriation for use upon his own lands. The question of a contemplated use elsewhere was not made, so that these cases are not authority here.

The general purpose of an appropriation is to utilize the water in the arid regions, where the supply is limited, for the development and advancement of beneficial industries. In many localities where the water is difficult of diversion, and the expense considerable in conducting it to the place of use, if individual landholders, or even an aggregation of them, were required to make the appropriation for use upon their own possession, these general purposes would be entirely defeated simply for the reason that such holders could not bear the burden of making the appropriation. In such cases other persons possessing capital are often willing to make the diversion for the benefit of those who have use for the water, but, unless they may contemplate a use which may be applied by the landowner to his possessions, they could not even initiate the appropriation until they had possessed themselves of lands in proportion to the amount of water it is desired to appropriate; so that if the user must be the appropriator, and the appropriator the landholder, the arid regions in many places would remain arid, whereas

otherwise they could be made to teem with fertility.   No sufficient reason has been suggested why the contemplated use may not be for and upon the possessions of a person other than the appropriator; the authorities we have seem to support the rule that it can be, and we believe it is correct upon principle.   We take it, therefore, that the bona fide intention which is required of the appropriator to apply the water to some useful purpose may comprehend a use to be made by or through another person, and upon lands and possessions other than those of the appropriator.   Thus the appropriator is enabled to complete and finally establish his appropriation through the agency of the user.

In Colorado, within the meaning of her constitution, it is held that the appropriation of water consists of two acts:   First, a diversion; and, second, the application thereof to a beneficial use, and the latter is declared to be the essential act; hence it is there established that canal companies which are engaged in diverting the water and carrying it to the consumer are to be "regarded as an intermediate agency existing for the purpose of aiding consumers in the exercise of their constitutional rights, as well as a private enterprise prosecuted for the benefit of its owners."   *Farmers' High Line Canal Co.* v. *Southworth,* 13 Colo. 130 (4 L. R. A. 767, 21 Pac. 1028); *Wyatt* v. *Larimer Irrigation Co.,* 18 Colo. 308 (36 Am. St. Rep. 280, 33 Pac. 144).   In effect, the carrier, that is the canal company, stands in the relation of an agent to the user, who must be regarded as the principal.   But where a third element is essential to a valid appropriation, consisting of an intent which, by the nature of things, is peculiarly the act of the appropriator, and which must precede all others in the process of appropriation, it would seem that he who designed the scheme and made the diversion was the principal, rather than the user, who applies the result of the

former's labor to his beneficial purpose. But, in whatever capacity the parties to the appropriation may be considered, the result is the same, the water of a public stream is eventually applied to a beneficial use, and the general purposes of such appropriations accomplished. As to who, in general, would own the appropriation when completed, it is not necessary for us to say at this time. We are of the opinion, however, that it is the subject of contract between the person who initiates the appropriation and the user. Nor is such a rule consistent or congenial with the creation and fostering of monopolies in the use of the waters of public streams. The appropriator cannot withhold the water from a beneficial use. He must be diligent in making the diversion, or else he loses his inceptive right; and reasonably expeditious in making the application to a beneficial use, otherwise his appropriation will be measured by the quantity actually used; and he must not cease to use the waters appropriated, upon pain of suffering an abandonment. And going with all this is the primordial condition that when not using he must suffer others to use.

10. Tested by this understanding of the law, let us examine the plaintiff's appropriation. Mallett, Adams, and Lee contemplated a use, not only to be applied by themselves, but by such others as might come in under their ditch. They had in mind some persons with whom they had arranged to join them in the new settlement, should they find a suitable locality; and they expected others to come, as they did subsequently, some of whom they brought in themselves. Indeed, the very object of the scheme was to induce immigration and settlement, which they expected to accomplish by diverting the water, and conveying it to such localities as would be convenient for use, with a purpose of developing the appropriation with the aid of such other settlers as would apply the use.

They had a reasonable expectation that there would be a demand for water as soon as they could convey it to a convenient place for the intended use, and in this respect the scheme could not be said to be merely speculative, impracticable, or visionary. Their original scheme comprehended the building of the ditch as far as the Dunbar place or tap. This is shown by the fact that their survey comprehended only that portion of the ditch. They refused to build the Morfitt extension, but allowed him to construct it, and conveyed to him an interest in the main or original ditch. But it was no part of the original design to carry the water down for the use of Morfitt or other persons convenient to such extension, and the same may be said of the Danielson extension. It was incumbent upon Mallett, Adams, and Lee to begin and construct the works and appliances necessary to a diversion and conveyance of the water to the place of use with all due and reasonable diligence. This they did, and accomplished their purpose in this respect in. 1884. The fact that Lee dropped out could make no difference. Mallett and Adams carried forward the enterprise as it was conceived and had been entered upon by all the parties. It was also incumbent upon them to have at the time, or approximately with the time of completing such works and appliances, users ready and willing with sufficient lands and possessions to absorb the appropriation by application to a beneficial use within a reasonable time thereafter. They complied in part with this condition by arranging to divide their appropriation with Blanton, Brown, and others before they had completed the diversion; and at or near the time of such completion they contracted with others for transfers of additional subdivided interests, all of whom began the use of water through the ditch at about or near the time of the com-

pletion of the works and appliances for the diversion and conveyance of the water to the place of use."

In *Irwin* v. *Strait* (Nev.), 4 Pac. 1215, one Withington had purchased a tract of land, diverted water, and caused it to flow thereupon in April, 1867, but did not begin the proper use of it for irrigating purposes until the spring of 1868. In commenting upon this state of facts, BELKNAP, speaking for the court, says: "We do not think that, in exercising reasonable diligence to appropriate the water, Withington was bound to use it for irrigation during the year 1867. It may have been impracticable by reason of the season, or the difficulties incident to an unsettled country, to have applied the water to irrigation the same spring in which he made his purchase." So it would seem in the case before us that if parties, through the intervention of the appropriators, began the use of water as early as the irrigating season of 1885, there would have been the manifestation of sufficient diligence to prevent the appropriation from lapsing. Whatever diversions were made through the Morfitt and Danielson extensions cannot be considered as within the Mallett, Adams, and Lee appropriations, as their contemplated use did not comprehend an application through either of these extensions; and, as far as any appropriations made by parties through these extensions are concerned, they must be considered as individual appropriations, independent of that made by Mallett, Adams, and Lee, and their inception must date from the time of actual user, or at most from the time of the commencement of use in each individual case. There was an enlargement of the ditch in 1888, and a change of the point of diversion, and at or subsequent to that time parties began the use of water; but the evidence is too meager by which to fix the date and quantity of such appropriations, and hence they can have no place in this investigation. The Nevada Ditch

Company, the plaintiff herein, has acquired various sub-
divided interests of parties who acquired through Mallett,
Adams, and Lee, and to this extent it must be consid-
ered as the owner of their appropriation.  The stockhold-
ers may or may not be entitled to the use of water, as it
regards the company, in proportion to the number of
shares of stock they hold therein, but the stock is in no
way the measure of the appropriation.  The change of
the point of diversion has worked no one an injury, and
hence none can complain: *Cole* v. *Logan.*

Now as to the quantity of plaintiff's appropriation:
There are 1,643 acres under cultivation, which can be
traced with reasonable certainty to users who began the
use of water in 1883, 1884, and 1885, and 160 acres addi-
tional, which may be traced to a commencement in 1886.
In 1894 there was irrigated under the two first sections
of the ditch about 1,970 acres.  Parties have been dili-
gent in reducing their lands to cultivation, and yet at
the time of the commencement of this suit had not re-
claimed all their holdings as intended or desired.  In the
opinion of the referee, the capacity of the ditch was 2,082
inches, miner's measurement, 1886, and at that time car-
ried water to its full limit, all which was actually utilized
for beneficial purposes.  While the capacity of the ditch
is not the measure of the appropriation, it nevertheless
becomes a potent factor in the ascertainment of the pri-
mary intention and establishment of the appropriation,
where the evidence touching the use and its inception is
indefinite.  It requires about one inch of water to the
acre for successful irrigation, and when the land is new
even more; but upon an average an inch an acre will suf-
fice for the irrigation of the lands under the first two sec-
tions of the Nevada ditch, including loss by seepage and
evaporation.  Thus considered, plaintiff's appropriation
would range from 1,643 to 1,970 inches, measured by

actual user.   Upon the whole, we think plaintiff should
be allowed an appropriation of 2,000 inches of water,
miner's measurement, which has for its commencement
by relation to August or September, 1881, if not to June
12 of that year, the date of posting the notice.

11.   As regards the agency ditches, the Pacific Live
Stock Company claims an appropriation prior to the
plaintiff.   It is contended that the government, having
set aside the Malheur Indian Reserve, and its officers and
agents having constructed the two Agency ditches, di-
verted the water thereby, and used it for agricultural and
mechanical purposes, making an appropriation of the water
for beneficial uses, with like effect as if it was a private
individual; and that, having granted the lands upon which
the ditches are located and the water was utilized, with
their appurtenances, the grant carried with it the appro-
priation, all which the Pacific Live Stock Company has
acquired through mesne conveyances from the govern-
ment.   Actual diversion and use for beneficial purposes
will constitute an appropriation; but is such the effect
when the government has made the diversion from a pub-
lic stream, and applied the use to government property,
although for beneficial purposes?   Prior to September 12,
1872, the lands comprised in the Malheur Indian Reserva-
tion were a part of the public domain, but by executive
orders of date September 12, 1872, May 15, 1875, and
January 28, 1876, they were withdrawn from settlement,
and set apart for the use and occupancy of the Snake
and Piute Indians.   By executive orders of date Septem-
ber 13, 1882, and May 21, 1883, the whole reserve was
again restored to the public domain, except 320 acres
upon which the old Camp Harney military post buildings
were situated.   On May 23, 1883, the agency buildings,
and sections 3 and 10, Tp. 19 S., R. 37 E., upon which
they were situated, were ordered sold, in accordance with

the provisions of sections 2122 and 2123, United States
Revised Statutes. The remaining portions of the lands so
restored to the public domain were thrown open to settle-
ment. E. L. Bradley having pre-empted the lands in
section 4 upon which the heads of both ditches are located,
the government issued to him the usual patent therefor,
containing the following conditions and reservations, viz.:
"To have and to hold the same, together with all the
rights, privileges, immunities, and appurtenances, of what-
soever nature, thereunto belonging * * * sub-
ject to any vested and accrued water rights. for mining,
agricultural, manufacturing, or other purposes, and rights
to ditches and reservoirs used in connection with such
water rights, as may be recognized and acknowledged by
the local customs, laws, and decisions of courts, etc." This
patent was issued November 26, 1889. T. M. Overfelt
purchased the agency buildings, with sections 3 and 10,
and on May 9, 1885, a patent was issued to him for these
buildings and premises, with like conditions and reserva-
tions in every respect as the Bradley patent, except the
words "improvements, tenements," are inserted and pre-
cede the words "rights, privileges, immunities, and appur-
tenances."

It has been the policy of the general government from
an early date, when the exigencies of the public service
required it, for the President, through the instrumentality
of executive orders, to reserve such portions and parcels
of the public domain from sale and settlement as seemed
expedient, and thereby set them apart for public use, and
it may be conceded that the President had competent
authority for so doing: *Grisar* v. *McDowell*, 73 U. S. (6
Wall.) 381. It may be predicated of the waters of non-
navigable streams upon the public domain, that are not
appropriated by the methods cognizant to law, that they
are as much the property of the government as the lands

through which they flow: Kinney on Irrigation, § 134. HILLYER, J., in *Union Mining Co.* v. *Ferris,* 2 Saw. 176 (Fed. Cas. No. 14, 371), says: "A stream of water is a part and parcel of the land through which it flows, inseparably annexed to the soil. * * * The government, as proprietor of the land through which a stream of water naturally flows, has the same property and right in the stream as any other owner of land has, be it usufructuary or otherwise." See also *Vansickle* v. *Haines,* 7 Nev. 249. In the *Mining Debris Case,* 9 Sawy. 492 (18 Fed. 753), SAWYER, C. J., says: "As owners of the public lands, the United States, like any other owner, could sell them in large or small quantities, and convey a fee simple title to their grantees, or could lease them, or reserve them from sale, or grant a limited estate, subject to easements granted to others. * * * They could do all this with their own lands, held in the character of proprietor, merely as the public lands are held." In short, the government can deal with its lands as other land proprietors can deal with theirs. In the Pacific Coast states congress has recognized the privilege of private citizens to acquire usufructuary interests in the waters of public streams, independent of riparian ownership. This is but one way, however, of disposing of the public domain. A new and peculiar right is carved out of it, and settled upon private persons, either in their individual or corporate capacity. Now, if such an estate may be carved out of the public domain for an individual, it may be reserved by the general government, but the waters of non-navigable streams are part of such public domain, and hence the property of the government, which may lay hold of and use them, without taking any of the steps made necessary to obtain an usufructuary interest therein by private individuals. But if it would prevent individuals from acquiring interests by prior appropriation, it would seem that there should be a

reservation made of such waters either by act of Congress or some executive order.   Such has not been the case here.   The most that can be predicated of the acts of the government and its officers and agents, in the diversion and use of waters in connection with the agency lands, buildings, and machinery, is that it was a reservation for a public use, not an appropriation for a beneficial use in that sense, although actually used by the government for beneficial purposes, which was also a public use. It was a use the government could employ so long as it saw fit, but it is not clear how a public use could become appurtenant to the soil so as to pass with it to a private individual.

12.   The public use which the government employs, and the usufructuary interest acquired by the individual by appropriation, are two distinct and different things; the latter may and does pass appurtenant to the soil, but the moment the government parts with its domain to a private individual the public use is abandoned, unless a like use is by special and competent stipulations passed to him by his grant.   It is not claimed that such was the case here.   But when the reserve was thrown open to sale and settlement the reserved lands were thereby restored to the public domain, and the public use abandoned, and such would surely be the effect as it relates to any reservation of the waters of such domain for a like use.   This, of course, proceeds upon the assumption that the use made of the waters by the officers and agents of the government had the effect of a formal withdrawal thereof by competent authority under the government, but we do not decide that such was in reality the effect of such use.   Such we think would be the effect of a restoration to the public domain, and the ordinary patent would not carry with the lands the public use made of the waters upon such lands as an appurtenant thereto.

13.   But if we are mistaken in this view of the question, there is another matter connected with the transaction which is fatal to the Pacific Live Stock Company's claim. It derives its title through patent from the government, which is a grant "subject to any vested and accrued water rights for mining, agricultural, manufacturing, or other purposes, and rights to ditches and reservoirs used in connection with such water rights, as may be recognized and acknowledged by the local customs, laws, and decisions of courts." This is an implied recognition of such rights of prior appropriators as had at the date of the patent been established, and a direct transfer expressly subject to such rights. And the patentee, and, *a priori,* his successor in interest, can take no larger estate than the government has been pleased to grant: Kinney on Irrigation, § 148. So that the company is especially estopped by its muniments of title from claiming as a specific grant from the government, whether as an appurtenant or otherwise, the usufruct of the waters of the Malheur River and its tributaries, as against any and all persons who acquired rights as prior appropriators of the waters of such streams before the issuance of the patents to Bradley and Overfelt. The addition of the words "improvements and tenements" in the Overfelt patent cannot enlarge the grant, except in so far as is quite apparent from the incidents and the patent itself that the government meant to pass the title to the agency buildings as well as to the land. In this view of the matter, the Pacific Live Stock Company must depend for its water rights upon such appropriation as was initiated by Overfelt & Co., after possession of sections 3 and 10 was surrendered to them by the government. It appears that they took possession in April, 1885, prior to the issuance of the patent, and that they at once repaired both these ditches, and began the use of water through them for useful purposes. If such was the case, the incep-

tion of the Pacific Live Stock Company's appropriation antedates the patent to Overfelt, and was a right acquired independent of such patent, and such a right as one holding merely the possessory title to government lands might acquire.   But even the inception of the right, whatever it may be, cannot take an earlier date than April, 1885, which is long subsequent to the acquirement by plaintiff of its appropriation, and hence is subordinate thereto.

As concerns the Gillerman-Froman ditch, it has been suggested that the appropriation made by means of it had its inception with the Rinehart survey in 1877 or 1878, but Rinehart did not follow up the survey with the construction of the ditch and diversion of water, nor is there any privity of interest shown between him and the Gillerman-Froman people, so it is plain there is no merit in the suggestion.   In the absence of such privity the Gillerman-Froman appropriation is clearly subsequent in time to that of the plaintiff.

For the Malheur Farmers' Irrigating Ditch Company it is claimed that its appropriation had its inception with the Osburn surveys in 1880, and the posting and recording of a notice of appropriation claiming 5,000 inches of water a mile and a half above the head of its ditch.   But Osburn and Limeberger did not exercise reasonable diligence in making their diversion, and there is no relation between their attempted appropriation and the one which the company now possesses.   Hence its appropriation is also subordinate to plaintiff's.

Eastman Bros. & Ballentine acquired no rights to their appropriation earlier than 1884, nor did the Sand Hollow Ditch people prior to July, 1885.   The Warm Spring Valley ditch was constructed without notice in 1888, and it is not claimed that any appropriation was made through the Harper's Ranch ditch earlier than April, 1883.   So

that all these appropriations are subservient to that of the plaintiff.

These considerations lead to a modification of the decree of the court below, and a decree will be entered here establishing the plaintiff's appropriation of 2,000 inches of water, miner's measurement, and enjoining all the defendants who are parties to the appeal from diverting any of the waters of the Malheur River until the plaintiff receives the amount of its appropriation. The case will be remanded to the court below, with directions to carry the decree into effect.

MODIFIED.